UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| GABRIEL OLIVIER, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF BRANDON, MISSISSIPPI, and WILLIAM A. THOMPSON, JR., individually and in his official capacity as Chief of Police for Brandon Police Department <br><br> Defendants. | CIVIL ACTION NO: 3:21-cv-636-HTW-LGI <br><br> **VERIFIED COMPLAINT** |

Comes now Plaintiff Gabriel Olivier and avers the following:

## INTRODUCTION

1. This is a civil rights action brought by Gabriel Olivier ("Olivier") against City of Brandon, Mississippi ("Brandon") and William A. Thompson, Jr., individually and in his official capacity as Chief of Police for City of Brandon Police Department ("Chief Thompson"), challenging the constitutionality of Brandon Code of Ordinance § 50-45 "Designating a protest area and related provisions regarding public protests/demonstrations during events at the Brandon Amphitheater."

2. Section 50-45 prohibits Olivier from communicating his religious beliefs – whether conveyed through oral dialogue, signs, literature, or one-on-one conversation - on city-owned sidewalks bordering city street in a city park outside the amphitheater, forcing him to go to a "protest" area where he does not have a meaningful audience for his message.

3. Pursuant to 42 U.S.C. §§ 1983 and 1988, Olivier seeks injunctive relief, declaratory relief, and nominal damages against defendants.

4.       Defendants have invoked and applied § 50-45 to deprive Olivier of his constitutional rights.

5.       Every act specified herein was committed by defendants under the color of state law and authority.

## JURISDICTION AND VENUE

6.       This cause of action raises federal questions, particularly, under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7.       The Court has jurisdiction over Olivier's claims for injunctive relief and nominal damages under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over Olivier's request for declaratory relief under 28 U.S.C. §§ 2201 and 2202. And the Court has jurisdiction over Olivier's claims for costs and attorney fees under 42 U.S.C. § 1988.

8.       Venue is proper in the Southern District of Mississippi under 28 U.S.C. § 1391(b) since defendants reside in this district and all claims arise out of this district.

## PLAINTIFF

9.       Plaintiff Olivier is a resident of Terry, Mississippi.

## DEFENDANTS

10.      Defendant Brandon is a municipal governmental authority in the State of Mississippi and has the capacity to enact regulations pertaining to the use of city sidewalks, streets, and parks.

11.      Defendant Chief Thompson is the Chief of Police for the Brandon Police Department. In his official capacity, Chief Thompson is responsible for overseeing and implementing all policies affecting law enforcement, including enforcement of ordinances on

public sidewalks, streets, and parks in the city. Chief Thompson is sued individually and in his official capacity.

## STATEMENT OF FACTS

### *Olivier's Desire to Engage in Evangelistic Expression*

12. Olivier is an evangelical Christian who wants to share the gospel (good news) of Jesus Christ and other aspects of his Christian beliefs with others.

13. He imparts a religious, evangelistic message that everyone sins and deserves eternal damnation but Jesus Christ grants salvation to those who repent and believe in him.

14. In delivering this message, Olivier identifies sins he believes are relevant for the community at large, like drunkenness and abortion, that require repentance.

15. Olivier evangelizes in public areas outside of well-attended events where he can find significant pedestrian traffic so he can reach as many people as possible with his message.

16. When sharing his faith, Olivier is often accompanied by family and friends.

17. Olivier uses various means to spread his evangelistic message.

18. Among which, he uses signs and banners that reference the gospel message with scriptural references. He typically has a sign dealing with abortion with him as well.

19. Olivier also hands out literature expounding on the gospel message. Leafletting is a particularly effective method for Olivier because he can give his information to people as they walk by him.

20. Additionally, Olivier wears expressive clothing bearing religious messages.

21. Olivier especially wants to engage individuals in friendly one-on-one conversations while standing at a comfortable, conversational distance away from them. He believes this method

3

is an effective means to get his message across, allowing for questions and give-and-take verbal exchanges.

22.     Moreover, to bring attention to his message, Olivier often delivers speeches about his faith, which he refers to as preaching.

23.     When preaching, Olivier uses a hand-held amplification device so he can address individuals in a conversational tone.

24.     Olivier strives to be respectful and winsome with his communications. He does not block pedestrian traffic or hurl insults at people.

25.     Olivier particularly wants to share an evangelistic message on public sidewalks located on either side of Boyce Thompson Drive, a public street in Brandon, where the street runs in Quarry park near an intersection with the main paved entryway into the Brandon Amphitheater. At these locations Olivier can find meaningful pedestrian traffic flow on days of amphitheater events.

### *Olivier Shares his Religious Beliefs on Public Sidewalks Outside Brandon Amphitheater*

26.     Brandon owns and maintains Quarry park, a 250-acre park that contains baseball facilities, a dog park, running/biking/nature trails, multiple large green spaces, and several parking lots, as well as the Brandon Amphitheater.

27.     The Brandon Amphitheater is likewise owned by the city. Opening in the spring of 2018, the entertainment venue acts as host to various musical concerts, comedy acts, and other ticketed events.

28. After learning about the Brandon Amphitheater, Olivier, along with family and friends, went to Quarry park on event days to share his religious message about 5 or 6 times in 2018 and 2019, staring with the first concert occurring in the amphitheater in April of 2018.

29. On these occasions, Olivier stood on the public sidewalks on both sides of Boyce Thompson Drive near the intersection with the main entryway to the amphitheater to share his message.

30. Olivier intentionally used these portions of the sidewalks near the intersection because these locations give him an opportunity to address pedestrians as they walked to the amphitheater without getting in their way.

31. Per his custom, Olivier shared an evangelistic message on these sidewalks through preaching, literature, and conversation. He also displayed a sign sharing his views on abortion.

32. On several of these visits, Brandon police officers working amphitheater events approached Olivier and company and inquired of their purpose. Referring to Olivier's speech as a "protest," the officers suggested they move to a place where attendees would not see or hear their message.

33. However, Olivier was not inclined to move. He reminded the police officers of his constitutional right to speak on public sidewalks and the officers relented, letting Olivier continue with his speech.

### *Brandon Passes Ordinance to Curb Oliver's Speech*

34. Unknown to Olivier, on December 2, 2019, Brandon passed ordinance § 50-45 entitled: "Designating a protest area and related provisions during events at the Brandon Amphitheater" designed to curb his speech.

35. Section 50-45 reads:

### Sec. 50-45. Designating a protest area and related provisions regarding public protests/demonstrations during events at the Brandon Amphitheater.

(a) Three hours prior to the opening of the Brandon Amphitheater to event attendees for a live ticket concert event ("event") and one hour after the conclusion of the event, individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the restricted area shown in exhibit "A" attached hereto, except in the designated protest area as shown on exhibit "A" attached hereto.

(b) The protest area is available to individuals and/or groups during the time specified in subsection (a) above, without the necessity of pre-notice or permit, subject to the following terms and conditions:

  (1) All individuals and/or groups shall be and remain wholly within the protest area while actively engaged in public protests and/or demonstrations. Vehicles are prohibited in the protest area;

  (2) The use of lasers, blinking or blinding lights, electric drums, or other amplified percussion or musical instruments, or equipment except as provided herein-below, is prohibited;

  (3) The use of a megaphone and/or loudspeaker which is clearly audible more than 100 feet from where the protest area is located is prohibited;

  (4) Libel, slander, obscenities, and/or speech than incites imminent violence or law breaking is prohibited;

  (5) The use of ladders, step stools, tables, chairs, buckets and/or any other object or thing that is customarily used to heighten an individual from the ground is prohibited;

  (6) Temporary signs are permitted; however, wooden, or metal signs or sign stakes made from hard material that may be used as a weapon are prohibited. All signs must be hand-held and shall not be affixed to anything in the protest area or otherwise affixed to the protest area. The top of any sign may not be elevated more than four feet beyond the height of its holder.

  (7) Anything brought onto the protest area shall be removed within 75 minutes of the conclusion of an event.

  (8) Each group shall have a representative who shall be present at all times while the group is, in whole or in part, within the protest area. The representative shall, when reasonably requested by the chief of police and/or his designee, provide photo identification.

  Individuals who are engaged in a demonstration and/or protest shall maintain on their possession while in the protest area photo identification and provide the same to the chief of police and/or his designee as and when reasonably requested. Requests for

identification by the chief of police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

(c) In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in section 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the protest area and is not be permitted to return to the protest area during the event on the day of the violation and if the same individual violates the provisions herein again during an event in the same calendar year, the individual shall be removed from the protest area and is not be permitted to return to the protest area during any event for the remainder of that calendar year.

36. Section 50-45 references an Exhibit "A" showing a map of The Quarry, the restricted area, and the designated "protest" area, as shown below:

Exhibit "A"



identification by the chief of police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

(c) In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in section 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the protest area and is not be permitted to return to the protest area during the event on the day of the violation and if the same individual violates the provisions herein again during an event in the same calendar year, the individual shall be removed from the protest area and is not be permitted to return to the protest area during any event for the remainder of that calendar year.

36. Section 50-45 references an Exhibit "A" showing a map of The Quarry, the restricted area, and the designated "protest" area, as shown below:

Exhibit "A"



37.     Due to the advent and effect of COVID-19, and resultant cancellation of amphitheater events, Olivier was not able to share his message on the sidewalks outside the Brandon amphitheater in 2020 or during the first several months of 2021. He therefore did not encounter enforcement of § 50-45 until he came back to visit the area in May of 2021.

*Brandon Applies Ordinance to Eliminate Olivier's Speech Outside Brandon Amphitheater*

38.     In March of 2021, Brandon announced that it would soon bring concerts to the Brandon amphitheater.

39.     Olivier heard this news about reopening the amphitheater and planned to attend the first concert of the year, a Lee Brice concert, slated for May 1, 2021.

40.     Olivier also heard about a new ordinance Brandon passed that could possibly restrict his speech and he read it online. The ordinance did not dissuade him from going back to the area, though. He did not believe Brandon would limit his protected speech on a public sidewalk.

41.     On the day of the concert, May 1, 2021, Olivier drove to Quarry park and parked in parking lot B at around 6:00 p.m. that evening, about an hour and a half before the Lee Brice concert was scheduled to start. Olivier was joined by his wife, daughter, and several friends who intended to share the gospel that night.

42.     Olivier and his group brought some signs with them, including an abortion sign, gospel literature, and a hand-held amplification device. They also wore expressive clothing with scriptural messages.

43. As Olivier exited his vehicle and waited on his friends to join him, he noticed a couple of police officers riding up in a golf cart.

44. The cart came to a stop and Chief Thompson stepped out of it. He walked up to Olivier and abruptly told Olivier about § 50-45, handing him a copy of it with an attached map showing the restricted area.

45. The chief informed Olivier they have a "special" spot set up for them on the other side of the hill off of a sidewalk and out of traffic, indicating that it was not far from a parking lot.

46. Olivier found it strange the chief approached them before they began to speak but he wanted to cooperate if possible. He asked the chief if the area was sectioned off and the chief confirmed the markings.

47. Chief Thompson added that the "only big thing" for the designated spot was some unspecified limitation on amplified devices.

48. The chief concluded that if the group follows the conditions and stays out the road that they will not hear from the police. He tells Olivier his name, hops back in the golf cart, and leaves.

49. Olivier reviewed the ordinance. He and his group decided to go check out the designated spot, hoping the area would be at or somewhere close to where they usually stand and speak.

50. Olivier and his friends prayed and then walked up the sidewalk running alongside parking lot B and onto the sidewalk bordering Boyce Thompson Drive on the southern side of the street and started looking for the designated area.

51. After reaching Boyce Thompson Drive, Olivier did not see any marked-off area close to where they typically stood near the main entryway to the amphitheater.

52. Olivier initially had trouble finding the designated spot. He looked where the chief seemed to be indicating on the south side of the street but did not see a designated area.

53. Someone in Olivier's group suggested the spot must be located west of where they were standing. He could not see a designated area but started walking in a westerly direction.

54. As they walked, Olivier spotted what appeared to be a marked-off area on the north side of street approximately 265 feet away from the intersection area where they usually stand and speak.

55. Observing where the spot was located, Olivier figured the designated area was not workable because it is so far away from the intersection area and pedestrian traffic patterns. But he walked toward the spot to inspect it up close.

56. Arriving at the spot, Olivier noticed the protest area was a marked-off box between Boyce Thompson Drive and parking lot A. He also observed that there is no adjoining sidewalk on this portion of the street.

57. He also noticed the protest area is a relatively small area of 29 x 15.9 feet, which is a tight space for his size group of 7 people.

58. Olivier saw a sign in the back of the box labelling the space as a "protest" area and containing a list of rules for behavior in the area as set out in § 50-45. The city placed a rope between two poles in the back of the protest area to mark off the boundary line for the box between the area and parking lot A.

59. Olivier determined he could hardly reach anyone with his message if he was forced to stay in the protest area.

60. The protest area does not offer Olivier opportunity to hand out literature or have conversations with people because no pedestrians walk by the protest area. This space is not part of or near a pathway running between the amphitheater and where someone would park for an event.

61. Olivier also deduced he could not hand out literature or converse with anyone parking in parking lot A. The rope boundary marker kept Olivier and his group approximately 10 feet from the parking places nearest to the protest area. And Olivier doubted anyone would park that close to the protest area anyway, since those parking places are furthest in the lot from the amphitheater.

62. Olivier further assessed he could not effectively use his expressive clothing or signs in that space. No one could read the messaging on his or his friend's shirts due to the distance between them and pedestrian flow.

63. Neither could his signs or banners be read due to the rules imposed in the protest area. One of the rules prevents him from using a pole for his signs and banners. He could only hold up a sign with his hands and then only no higher than 4 feet of height of the holder. They are also not allowed to use a step stool or anything else that could elevate their signs. No pedestrian could read his signs due to distance and limited elevation.

64. Olivier also concluded that his preaching would be futile in the box due to the rule prohibiting amplified speech audible from 100 feet away. Under this constraint, he could not speak in the protest area and be heard, much less understood, by a vast number of visitors walking from

their cars to the amphitheater through the main entryway. The pedestrian traffic flow crosses at least 200 feet away from the protest area.

65. Given the inherent difficulties with the protest area, Olivier wanted to explore other options. He did not see any other available protest area.

66. Olivier further did not believe their speech should be relegated to the protest area. Though they had a sign conveying an objection to abortion, their purpose was to evangelize. Olivier also believed the restrictions were an unconstitutional infringement on his speech.

67. Wanting a place where they could convey their message, Olivier and his group walked to the sidewalk on the north side of Boyce Thompson Drive near the intersection with the entryway for the amphitheater, where they had shared their faith on previous visits.

68. However, a Brandon police officer approached Olivier and company as soon as they arrived at the desired spot.

69. The police officer reminded Olivier that his chief had already provided them with a copy of § 50-45 and that they have a designated spot for them down the road where a box is marked off.

70. Olivier asked the police officer if the road is public and he confirmed it is public but added Oliver has to be in the box to conduct his speech.

71. Olivier then asked the police officer if the sidewalk where they were standing is a public sidewalk and he confirmed this point as well, then reiterated to Olivier that he had to go the box to protest.

72. The police officer informed Olivier they needed to go to the protest area or he would ask them to leave.

73. Olivier did not believe they should have to go to the box to speak. He informed the officer that they were not planning to protest but exercise their religious freedoms. Olivier advised how he could not reach anyone if forced to stay in the box.

74. In lieu of addressing his concerns, the officer advised his supervisor was on the way.

75. Convinced of having a right to share religious views on that sidewalk, Olivier advised his friends to carry on with their speech. One friend started to preach and another held up a gospel banner. Olivier cautioned the group to stay on edge of sidewalk so as not to block egress.

76. The police officer repeated to Olivier that the group needed to move to designated area.

77. Olivier raised his constitutional rights, but the officer was steadfast, repeating that they had to go to the protest area.

78. Olivier referenced the public nature of the area and the police officer referenced the ordinance.

79. Olivier advised the city could not keep them from exercising his religious freedoms.

80. He also asked the police officer to identify himself but the officer declined.

81. At that point, Chief Thompson drove up in a golf cart.

82. The chief told Olivier he had to enforce the ordinance and the ordinance required Olivier to go the designated area.

83. Olivier advised Chief Thompson of his concerns and his calling to share the gospel. He told him they are not protestors and that he could not effectively share his views in a place so far away.

84. The chief responded they do not make the law but enforce it. He said the ordinance is the law and that they could go back to the designated area or leave.

85. Olivier was willing to comply with the chief's order but he knew the police were violating his constitutional rights. He asked the chief if he could confirm that Boyce Thompson Drive and the sidewalks on both sides of the street are public, and he did.

86. The chief then asked Olivier whether he would go back to the area or leave.

87. Olivier informed he was trying to figure it out but did not understand how Brandon could disallow their speech on a public sidewalk.

88. The chief was unwilling to engage in the constitutional propriety of the restriction. He reiterated that he will do what the law says, that he is there to enforce the law, and reminded Olivier of his options.

89. Olivier asked if the request was made under the threat of arrest and Chief Thompson confirmed that it was under such threat.

90. Olivier was astounded. He asked the chief if he would really arrest people for standing and speaking on the sidewalk.

91. The chief then declared he was arresting Olivier for violating the city ordinance.

92. Chief Thompson looked toward others in the group and asked if any of them wanted to leave.

93. Noting the real threat of arrest, Olivier advised he and the others would voluntarily leave the area. But at that point Chief Thompson was determined to arrest them.

94. The chief arrested Olivier's friend who was preaching on the sidewalk and directed another police officer to arrest Olivier. The police officers handcuffed Olivier and his friend behind their backs and had them sit down on the grass to wait for a patrol car.

95. After sitting there for several minutes, a few police officers drove up in separate vehicles. One of the officers escorted Olivier to the back of a patrol car, where he sat for several more minutes without the patrol car moving.

96. The police officer then drove Olivier to the Brandon police station. The officer retrieved Olivier from the back seat and walked him to a processing area, where they kept the handcuffs on him.

97. After processing, which lasted about an hour, the police released Olivier on his own recognizance. The police officer had him fill out a release on recognizance bond and handed him a notice of court appearance requiring Olivier to appear in Brandon municipal court on May 5, 2021.

### *Brandon Prosecutes Olivier for Violating § 50-45*

98. Olivier obtained a continuance of his court date until June 23, 2021.

99. On his scheduled court date, Olivier appeared and pled no contest to the charge. The municipal judge rendered a sentence of 10 days of jail and a fine of $304.00.

100. Olivier paid the fine of $ 304.00 on August 2, 2021.

### *Brandon Continues to Stymie Olivier's Speech with § 50-45*

101. Olivier yearns to share his religious message on public sidewalks bordering Boyce Thompson Drive near the main entryway to the Brandon Amphitheater but he is chilled and deterred from returning to the area during amphitheater events and engaging in his desired

expression due to § 50-45 and Brandon's demonstrable willingness to enforce this ordnance against him.

102. Section 50-45 persists in restricting Olivier's religious expression on city-owned sidewalks bordering a city street in a city park.

103. Olivier's fear of criminal arrest and other sanctions stymies his constitutionally protected expression on public ways.

104. The adverse impact of chilling and deterring Olivier from exercising his constitutional rights on public ways constitutes irreparable harm to him.

105. Olivier has no adequate remedy at law for the loss of his constitutional rights.

## FIRST CAUSE OF ACTION

### *Violation of Free Speech Clause*

106. Olivier's religious expression constitutes protected speech under the First Amendment.

107. Section 50-45:

    a. enforces overly broad restrictions on protected speech;

    b. singles out a select type of speech for discriminatory restriction;

    c. chills the free speech and free exercise of religious expression of Olivier as well as that of third-party citizens;

    d. restricts speech on basis of content and viewpoint; and

    e. lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression.

108. Defendants have no compelling or significant interest that can justify their undue restriction on religious viewpoints which Olivier seeks to communicate on public ways.

109. Defendants have no compelling or significant interest that can justify enforcement of § 50-45 to eliminate speech in traditional public fora.

110. Section 50-45 violates the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Olivier respectfully prays the Court grant the equitable and legal relief set forth in his prayer for relief.

## SECOND CAUSE OF ACTION

### *Violation of Due Process Clause*

111. Section 50-45 contains vague language and lacks objective standards for guiding police officers. Vague language allows Defendants to enforce § 50-45 in an *ad hoc*, arbitrary, and in a discriminatory manner.

112. Defendants have no compelling or significant interest that can justify the unduly vague language of the ordinance.

113. Section 50-45 is void for vagueness and violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Olivier respectfully prays the Court grant the equitable and legal relief set forth hereinafter in his prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Olivier respectfully prays for relief in that this Court:

A. Assume jurisdiction over this action;

    B.    Enter a judgment and decree declaring § 50-45 is unconstitutional on its face and as applied to Olivier's religious speech, violating Olivier's rights and those of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

    C.    Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying § 50-45 to Olivier's religious expression on public sidewalks in Quarry park;

    D.    Enter a preliminary and permanent injunction enjoining Defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from enforcing § 50-45 to restrict protected speech in traditional public fora;

    E.    Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

    F.    That this Court award Olivier compensatory damages for injuries sustained and expenses incurred;

    G.    That this Court award Olivier nominal damages arising out of violation of his constitutional rights;

    H.    That this Court award Olivier his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

    I.    Grant such other and further relief as appears to this Court to be equitable and just.

Respectfully submitted,

/s/Nathan W. Kellum
NATHAN W. KELLUM
MS BAR # 8813; TN BAR #13482
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
Telephone: (901) 684-5485
Email: nkellum@crelaw.org
Attorney for Plaintiff Gabriel Olivier

## **VERIFICATION OF COMPLAINT**

I, Gabriel Olivier, a citizen of the United States and a resident of Terry, Mississippi, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

_____
GABRIEL OLIVIER