IN THE MUNICIPAL COURT OF JACKSON, MISSISSIPPI

THE CITY OF JACKSON, MISSISSIPPI

VS.

CAUSE NOS.: 21073492;
21073492A;
21073492B

BRYAN PEDEN, ALLAN GRANT SIDERS, and
~~BORIS CAMPOS~~

---

### OPINION AND VERDICT

---

Trial was held on September 16, 2021. The City of Jackson ("City") was represented by Mr. Keith Gates, Esq. Defendants Bryan Peden, Allan Siders, and Boris Campos (collectively "Defendants") were represented by Messrs. Cody Gibson, Esq. and Joel Dillard, Esq. The Court, having heard the witnesses' testimony and counsel's arguments, having considered and weighed the evidence and reviewed the applicable law, issues the following opinion and verdict:

## I.    BACKGROUND

### A.    INTRODUCTION

This matter was initiated by the criminal affidavits filed on June 26, 2021, by Matthew Robert Camp alleging that Defendants committed the crime of simple assault in violation of Mississippi Code § 97-3-7(1)(a)(iii).[1] Mr. Camp submitted two affidavits—one against Mr. Peden and one against Mr. Siders—alleging they on multiple occasions aggressively confronted and threatened him, shouted in his face that he was a fornicating sinner going to hell, and waived a Bible by his face like they would strike Mr. Camp with it, causing Mr. Camp fear of imminent

---

[1]    Miss. Code. Ann. § 97-3-7(1)(a)(iii) states: "A person is guilty of simple assault if he…attempts by physical menace to put another in fear of imminent serious bodily harm… ."

1

Exhibit 19

serious bodily harm. Mr. Camp submitted a third affidavit against Mr. Campos alleging that Mr. Campos sent Mr. Camp threatening Facebook messages, writing: "If I ever see you doing anything to Bryan [Peden], anything at all, me and you will have more words." Mr. Camp alleged that Mr. Campos's messages caused him fear of serious imminent bodily harm.

Mr. Camp's affidavits were accompanied by written narratives describing how, since April 2021, Defendants Siders and Peden engaged in a pattern of harassment targeted specifically at him. For instance, Mr. Camp described walking in Fondren, Mississippi, with his girlfriend, Amber Kipfmiller, when Mr. Siders, using a voice amplification system, allegedly screamed at him and Ms. Kipfmiller, calling him a fornicator and Ms. Kipfmiller a "Jezebel" and waiving a Bible in Mr. Camp's face, causing him to fear that Mr. Siders would strike him. Mr. Camp also alleged that, on May 1, 2021, Siders and Peden stood outside The Bean coffee shop in Fondren for over an hour and screamed (again through a voice amplification system) at Mr. Camp (among others sitting outside), calling him/them sinners and threatening that they were going to hell. Mr. Camp also alleged that Messrs. Siders and Peden targeted him personally, using his first name, ("Matt" or "Mathew"). Mr. Camp also described how Messrs. Siders and Peden discovered where he lives and continuously parked by his house.

Based on the Affidavits, the Court elected to conduct a probable cause hearing.

**B.    THE PROBABLE CAUSE HEARING**

The Court held the Probable Cause Hearing on August 16, 2021. Of the three Defendants, only Mr. Siders appeared with his counsel, Cody Gibson, Esq. The Court appointed Municipal Public Defender George Luter, Esq. to represent Defendants Peden and Campos in their absence. Keith Gates, Esq. represented the City, accompanied by the alleged victim, Matthew Camp, and a witness, Ms. Kipfmiller.

Mr. Camp credibly testified, consistent with Mr. Camp's criminal affidavits and the accompanying narratives, the Defendants repeatedly targeted and threatened Mr. Camp by, among other things, between April and July 2021:

1)    Invading Mr. Camp's personal space and screaming at him so closely that spit would land on his face (Siders);

2)    Screaming through a voice amplification system: "You're going to die, Matthew!" "I came for you, Matthew!" (Mr. Peden), and calling him a "sinner," "sissy," "effeminate," a "fornicator," and calling Ms. Kipfmiller a "Jezebel" (Siders).

3)    Aggressively approaching Mr. Camp and, when he would try to walk away, taunt and threaten him (Peden and Siders);

4)    Sending Mr. Camp threatening Facebook messages (Mr. Campos).

Defendant Siders did not testify, but his attorney, Mr. Gibson, and Mr. Luter on behalf of Messrs. Peden and Campos, cross-examined Mr. Camp.

Based on the testimony and evidence, which was heard without objection, the Court found probable cause to issue arrest warrants for all Defendants and set a trial on the merits. The arrest warrants were based upon the evidence precented at the probable cause hearing, not on the initial affidavits alone.

## C.    THE TRIAL ON THE MERITS

A consolidated trial of all Defendants went forward on September 16, 2021. Keith Gates, Esq. represented the City. Cody Gibson, Esq. and Joel Dillard, Esq. represented all three Defendants. Before trial, both sides submitted video recordings (and the City submitted a few pictures) to the Court that were received into evidence by the Court without objection from either party.

3

1.    **The City's case.**

a.    <u>Matthew Camp's testimony.</u>

The City first called the victim, Matthew Camp. Mr. Camp, a resident of Fondren who (formerly) enjoyed walking throughout his neighborhood and enjoying the area's businesses, testified that his first direct encounter with Defendants Siders and Peden came on April 4, 2021. On that date, Mr. Camp was walking with Ms. Kipfmiller (who was holding her small dog) when Defendant Peden approached him, stating, "I've seen you here before." Mr. Siders, using a voice amplification system, then began yelling at Ms. Kipfmiller and walking toward her and Mr. Camp. Mr. Camp, believing that Siders was threatening Ms. Kipfmiller, approached Mr. Siders and asked him to stop harassing her. Mr. Camp testified that Mr. Siders was dressed like "he was there to fight," wearing long sleeves, long pants, combat boots, and a backpack and that these could be hiding a weapon or body armor, and he felt threatened and fearful.

Mr. Camp testified that, after he told Mr. Siders to stop harassing Ms. Kipfmiller, he began to walk away, and Mr. Siders, stepping towards him, began screaming (through his voice amplification system) that Mr. Camp needed to repent, had a filthy mouth, a filthy heart, and that he and Ms. Kipfmiller would perish in hell and were filthy fornicators. At this point, Mr. Camp, fearing an imminent attack, testified he turned to confront Mr. Siders and said, "why don't you do something about it." Mr. Camp testified that, although terrified of Siders (who is a large, muscular man who greatly outweighs Mr. Camp), he feared that if he acted weak or scared, an attack was certain, and that he needed to demonstrate he would defend himself if necessary.

Mr. Camp testified Siders aggressively got in his face so closely that spittle from Mr. Siders's mouth flew onto Mr. Camp's face. Mr. Siders, according to Mr. Camp, called him a

"sissy," an "effeminate man," told him that "I came for you today!", that he (Camp) and his girlfriend were both going to hell, and waived a bible in Mr. Camp's face in a manner Mr. Camp perceived as threatening. Mr. Camp testified that he was terrified, particularly by Mr. Siders' military-style attire, size, and invasion of his personal space and use of electronic voice amplification. Mr. Camp further testified that Siders repeatedly mocked Ms. Kipfmiller as a "Jezebel," which Mr. Camp understood meant "slut" or "whore."

Video evidence from April 4th played by the City shows that Defendant Siders initiated the encounter by first addressing Ms. Kipfmiller after she refused a pamphlet someone handed her. Mr. Siders began walking toward her, using voice amplification, mocking her, saying (sarcastically) that she was "so kind and tolerant and loving" and began arguing with her.[2] At that point, Mr. Camp turned toward Mr. Siders, walked to him and asked him to stop talking to Ms. Kipfmiller; that he (Siders) had been harassing her (Kipfmiller) along with others in the area. Mr. Siders then began arguing with Mr. Camp, calling him a sinner, claiming he hated God, and said he had a filthy heart and filthy mouth. The video shows that Mr. Camp then tried to walk away, but Mr. Siders stepped towards him, yelling "you need to repent, you're gonna perish in hell." At this point, Mr. Camp turns around again and says, "how about you fucking do something about it?" and "I hope you do something." Mr. Camp then turns around to walk away again, and Mr. Siders begins mocking him, saying "you won't do anything." The video then cuts out and another begins.

The video resumes with Mr. Siders stepping toward Mr. Camp, screaming (still through electronic voice amplification) "that's right, let your Jezebel take you away!" Mr. Camp then turns

---

[2]    This video evidence was taken from body cams worn by Siders and others in his group, which they posted on YouTube.

5

around toward Mr. Siders as Mr. Siders keeps stepping toward Mr. Camp. Mr. Siders then continues to berate Mr. Camp, pointing his finger and his Bible in Mr. Camp's face as others associated with Mr. Siders begin to surround Mr. Camp and Ms. Kipfmiller. Mr. Siders continues to scream at Mr. Camp: "YOU'RE ON YOUR WAY TO HELL!" and "I CAME FOR YOU TODAY!" and "YOU LIVE LIKE THE DEVIL!"

The video then cuts out again, then resumes to show Mr. Camp and Ms. Kipfmiller walking away to shouts from an unidentified person: "I'll bet you're a fornicating Christian, too." Mr. Siders then turns to scream indiscriminately at no one in particular: "See! This is the problem in Jackson, Mississippi! … We got a lot of people profess with their mouth they're Christians while they live in sin! … With their filthy Jezebels leading them by the hand! We've got a lot of effeminate men! Pansy, sissy men, who won't stand up for the words of God!"

Video evidence, apparently taken later that day from Siders's body cam, shows Mr. Camp and Ms. Kipfmiller walking down the street in another part of Fondren. Mr. Siders walks to where they can see him and begins screaming: "YOU'RE GONNA WALK AWAY! LET YOUR JEZEBEL TAKE YOU AWAY! YOU WICKED DEVIL! YOU HATE GOD! GOD'S GONNA PUT YOU IN HELL!" "YOU'RE GONNA DIE! YOU WILL DIE, SINNER! YOU'RE GONNA DIE! YOU MIGHT DIE TODAY! YOU MIGHT DIE TODAY!" Mr. Siders screams so loudly that the body cam he wears shakes markedly. Mr. Camp testified that he was terrified by Siders's actions, which he perceived as threats of violence targeted against him.

Mr. Camp then testified (and video evidence shows) that, on May 1, 2021, while walking in and out of "The Bean" coffee shop in Fondren, Mr. Siders was present, within a few feet from the outdoor patio (where other patrons were seated) and (again using voice amplification)

6

screamed at Mr. Camp that "YOU'RE GOING TO HELL, SINNER!" and called him a "coward" and a "child of the devil" who "hated God" and would "bust hell wide open."

Mr. Camp then testified (and video evidence shows) that, on or about June 3, 2021, while walking in his neighborhood during a neighborhood event, "First Thursday," Defendant Peden (using a voice amplification system) began threatening him by name[3] and screaming through electronic voice amplification hooked to a large speaker atop a pole: "YOU'RE GONNA DIE, MATT! YOU'RE GONNA DIE AND MEET GOD ONE DAY, MATT! IT'S TIME TO REPENT, MATT! IT'S TIME TO REPENT, MATTHEW!" "IT WASN'T JUST A COINCIDENCE THAT WE'VE RUN INTO EACH OTHER SO MANY TIMES!" Mr. Camp testified that he perceived these as threats, causing him to fear imminent serious bodily harm.

Mr. Camp then testified that, on June 23, 2021, he received threatening Facebook messages from Defendant Campos: "You came at Bryan [Peden] yesterday, you coward. Your Jiu-jitsu is trash. If I ever see you do anything at all me and you will have more than words. You need Jesus Christ, you and your Jessebel [sic] girlfriend."[4] Mr. Camp testified that the messages caused him to fear bodily harm.

Then, Mr. Camp testified (and video evidence shows) that, on June 26, Siders standing outside the Jackson Women's Health Organization ("JWHO")—again encountered Mr. Camp when, as he returned home from on foot, walked the distance between the JWHO and his home. Referring to Mr. Camp by his first name, Siders screamed at full volume, "REPENT!",

---

[3]    Mr. Camp testified that Defendants Peden and Campos discovered his name when they appeared at his Jiu-Jitsu gym (Precision Martial Arts), as patrons. At that time, Mr. Camp told the gym's manager that he had been threatened by Mr. Peden. The manager then discussed the matter with Messrs. Camp and Peden after class. As noted below, Mr. Peden testified during trial that the gym's manager banned Peden and Campos from the gym because, according to Peden's own admission, other gym members complained and were fearful of Peden and Campos.

[4]    Screenshots of Campos's messages were entered into evidence at trial without objection.

"REPENT!", "REPENT!", until Mr. Camp reached his house. By the time he arrived home, he turned and Mr. Siders was still screaming "REPENT!" at him.

On cross-examination, when asked why he did not walk away from the April 4, 2021 encounter, Mr. Camp testified that he tried but did not know if Siders or the others would continue to follow him and he feared they would attack him as he retreated. Mr. Camp also admitted, as the video shows, that he stood up to Mr. Siders twice (after Siders stepped toward him). Asked if Mr. Campos was present for any of the alterations, Mr. Camp could not say.

On redirect, Mr. Camp explained that he only confronted Mr. Siders because he felt threatened and feared that if he acted weak and did not show that he would defend himself, he would increase the chance he would be attacked.

    b.  <u>Amber Kipfmiller's testimony.</u>

The prosecution then called Ms. Kipfmiller to the stand. Ms. Kipfmiller, who also lives in Fondren, testified that the Defendants have so harassed and intimidated her several times that she no longer walks alone around Fondren—her own neighborhood—because she fears their harassment.

Ms. Kipfmiller described the April 4, 2021 encounter between Mr. Camp and Mr. Siders, testifying emotionally that Mr. Siders stood in Mr. Camp's face, spitting all over him as he screamed that Mr. Camp needed to repent and that he was a sinner as other members of Mr. Siders's group began closing in on them. Terrified, she asked one of the group's members for help. This individual responded by telling her that she needed to put her small dog down. Ms. Kipfmiller testified that the manner in which the man told her to put her dog down led her to believe he wanted to harm her dog, further terrifying her. During the encounter, according to Ms. Kipfmiller (and

confirmed by the video evidence), Siders and others repeatedly called her a "Jezebel" and called her and Camp "fornicators."

According to Ms. Kipfmiller, she feared Mr. Siders was about to strike Mr. Camp, so she took an object from Mr. Siders, described as a "mic pack," hoping to diffuse the situation by cutting off Siders' ability to amplify his voice. Mr. Siders demanded she return it, which she did.

On cross-examination, when asked whether she and Mr. Camp Mr. Kipfmiller were "free to leave," Ms. Kipfmiller stated that they were trying to leave, but Mr. Siders would not stop threatening and screaming at them and moving towards them. Ms. Kipfmiller was also asked whether the term "Jezebel" has religious connotations. In response, Ms. Kipfmiller testified that Mr. Siders was using the term in a derogatory way and she understood "Jezebel" to mean "whore," which she found deeply offensive.

The City rested its case after Ms. Kipfmiller's testimony.

### 2.      The Defendants' Motion for Directed Verdict.

At the close of the City's case, the Defendants all moved for directed verdict. As to Mr. Campos, his counsel (Mr. Gibson) argued that sending messages over Facebook could not meet the "physical menace" requirement of Miss. Code Ann. § 97-3-7(1)(a)(iii). Quoting *Graham v. State*, 967 So. 2d 670, 675 (Miss. Ct. App. 2007), counsel argued that "physical menace demands something more than words."

Defense counsel then argued that only acts committed on April 4, 2021 could be considered because the charging affidavits allege criminal acts "on or about April 3, 2021" or April1 4, 2021, as agreed to by both sides, and according to counsel, the Court should not consider evidence after that date. Mr. Gibson also argued that, under U.S. Supreme Court precedent—*Snyder v. Phelps,*

9

562 U.S. 443 (2011)—Campos' and all Defendants' speech toward the victim was protected by the First Amendment.

The Court denied the motion as to Defendant Campos, but noted it had serious questions about whether Campos could be found guilty under § 97-3-7(1)(a)(iii) and would consider the issue further after researching the law independently and hearing all the evidence.

Counsel then argued that there was no evidence that Peden could have assaulted Mr. Camp except for the June 3 encounter and, because Peden was across the street in a public place when he yelled at Mr. Camp (specifically by name that he going to die), Mr. Peden could not have physically menaced Mr. Camp. Counsel again argued that yelling "you're going to die" is protected speech under *Phelps* and again argued that, because this conduct occurred after April 4, 2021, it was irrelevant and inadmissible since the charging affidavit alleged criminal conduct on or around April 3, 2021. The Court denied the motion.

Finally, as to Mr. Siders, counsel again argued his speech was protected under *Phelps* and that the evidence did not show Mr. Siders physically menaced Mr. Camp such that he feared imminent, serious bodily harm. Counsel argued that Mr. Camp could not have been in fear because he approached Mr. Siders and said, "why don't you do something about it" (after Siders started the confrontation by yelling at Ms. Kipfmiller). Counsel further argued that, because Mr. Siders never hit Mr. Camp, and because Mr. Siders was on public property, he could not be found guilty. The Court denied the Motion.

3.    **The Defendants' Case.**

a.    Allan Siders's testimony.

Mr. Siders testified he is in the landscaping business and is a preacher of the word of God as commanded by Jesus Christ, who comes to Fondren often to "preach," both at the JWHO and

neighboring businesses. According to Siders (and confirmed by video evidence), on April 4, 2021, he initiated communication with Mr. Camp and Ms. Kipfmiller by commenting to Ms. Kipfmiller, "that's very loving and tolerant of you" (through his voice amplification system) after she refused a pamphlet someone in Mr. Siders's group handed her as she and Mr. Camp were walking. Mr. Siders testified that Mr. Camp then initiated the confrontation by walking toward Mr. Siders. According to Mr. Siders, by this point, he knew Mr. Camp and Ms. Kipfmiller were fornicating sinners because it appeared they were on a date. He testified that men and women should not date according to the Bible. Mr. Siders testified that he then intended to instill fear into Mr. Camp – the fear of God.

When asked what he meant by calling Ms. Kipfmiller a "Jezebel," Mr. Siders claims it was a Biblical reference to a woman who dominates her husband and wears the pants in the family and was not intended to mean that Ms. Kipfmiller was a whore.

On cross-examination, Mr. Siders admitted to shouting at Mr. Camp and putting a Bible in his face, but claimed it was only to put distance between them. He admitted telling Mr. Camp he was going to hell, a fornicator, etc., and that he called Ms. Kipfmiller a Jezebel several times, but that he was just "soul winning" and preaching the Gospel, and that the Bible commands him to judge people like Mr. Camp, who he claims are sinners.

Upon further questioning by the Court about how he could possibly have known on April 4, 2021 that Mr. Camp Ms. Kipfmiller were "fornicating," he replied: "that's America and most people are living in sin." He denied calling Mr. Camp a "sissy" and "effeminate," but admitted that he called the people of Jackson such generally.

The Court then asked Mr. Siders about a video in evidence showing one of his group members outside the Corner Market in Fondren with a bullhorn yelling at customers. Mr. Siders,

11

who identified the individual as his "brethren," Gabe Olivier, testified that Mr. Olivier was merely preaching, and that he (Siders) had also "preached in that area". The Court then returned to the video of Mr. Olivier screaming at patrons of the Corner Market, and a Jackson Police Officer. The video shows Mr. Olivier calling the Officer a "coward," a "sissy," "effeminate," and that he needed to get some "baritone" in his voice. When asked whether he agreed with Mr. Oliver's actions, Mr. Siders testified that he did not disagree at all with Mr. Olivier's actions. Mr. Siders testified that he had right to scream at a police officer that he is a sissy, he's effeminate, and needs to get baritone in his voice. "Yes, if he is effeminate, he needs to know that. I don't disagree with that."

      b.     Bryan Peden's testimony.

Mr. Peden testified he works for the Mississippi Department of Transportation ("MDOT") and he's been preaching at the "abortion mill" for about four or five years. He stated that he was present on April 4, 2021, and that when he saw Mr. Camp walking with Ms. Kipfmiller, he said, "I've seen you here before." He then testified that he observed Mr. Siders say, "you need to repent and everything," engaging them for throwing down the pamphlet. Mr. Peden claims Mr. Camp came toward Mr. Siders. He then claimed there was some escalation, but then Mr. Camp and Ms. Kipfmiller walked off. Mr. Peden claimed he did not see Mr. Siders spit on Mr. Camp, but agreed their faces were very close together.

He then described the June 3 encounter with Mr. Camp when he (Peden) yelled through voice amplification that "YOU'RE GONNA DIE, MATT! YOU'RE GONNA DIE AND MEET GOD ONE DAY, MATT! IT'S TIME TO REPENT, MATT! IT'S TIME TO REPENT, MATTHEW!" "IT WASN'T JUST A COINCIDENCE THAT WE'VE RUN INTO EACH

OTHER SO MANY TIMES!"[5] Mr. Peden claimed that he only said it because he cares about Mr. Camp, that it's a "personal thing," and that he'd like to have Mr. Camp "join a Bible study" or something; that his preaching comes from a place of love and that he wants to prepare others like Mr. Camp for eternity. Mr. Peden testified only eternity matters; that nothing on this earth, or what happens in this Court, matters. Mr. Peden further testified that he could be locked up for the rest of his life and it wouldn't matter.

Other than April 4 and June 3, Mr. Peden testified that he has seen Mr. Camp around the "abortion mill" at times, possibly at what he called a "sodomite event" once, and that he's called him out to repent a few times.

Mr. Peden testified that Mr. Campos was not present for any of the incidents involving Mr. Camp.

On cross-examination, Mr. Peden agreed that he called Matt out directly and told him he was going to die, but said it was not a threat since all people will die one day. The Court then asked whether, on the day Mr. Peden yelled to Mr. Camp that he was "going to die" (June 3), Mr. Peden also stated "we're all going to die one day" or something similar. Mr. Peden testified that he did not.

The Defense then rested its case.[6]

---

[5]     Mr. Peden claimed he learned Mr. Camp's name from Precision Martial Arts, where they were both students. He testified that, one day, Mr. Camp waited until after class and confronted him and got loud and abused him and made him fear that Mr. Camp would fight him. Mr. Peden testified that they then met with one of the instructors, Josh Cannon, and that Mr. Camp eventually stormed out. Mr. Peden claimed that he feared that Mr. Camp and that Mr. Cannon promised to protect him while they were training and even escorted Mr. Peden from the gym to his car because, according to Mr. Peden, he feared that Mr. Camp might be waiting outside to attack him. Mr. Peden then testified (contrarily) that Mr. Cannon later banned him (and Mr. Campos) from the gym permanently because, according to Mr. Peden, other students "didn't feel safe around us."

[6]     A video sent to the Court by defense counsel, entered into evidence without objection and dated 5/1/21, taken from Siders' and Peden's body cams, shows their "brethren," Gabe Olivier,

After closing arguments by counsel, the Court took the matter under submission.

## II.    FINDINGS OF FACT

Most of the factual allegations are not disputed, and the video evidence provides good evidence of some, but not all, of the parties' interactions. The Court finds credible Mr. Camp's testimony, and it is the finding of the Court, that, on April 4, 2021, he was terrified by Siders' actions and reacted to Mr. Siders out of fear and concern that Siders might attack him or Ms. Kipfmiller. The video shows he engaged with Mr. Siders only after Mr. Siders started mocking Ms. Kipfmiller and stepping toward her. Mr. Camp, after the initial confrontation, tried to walk away multiple times, only to have Mr. Siders continue his verbal harassment and continue to step toward him. Mr. Camp's actions were taken out of fear that he, or Ms. Kipfmiller, was about to be attacked. His fear of attack is particularly understandable given Mr. Siders' imposing, military-style attire and threatening language amplified through a loudspeaker.

---

outside The Bean in Fondren, only a few feet from its patio, yelling through a voice amplification system at patrons. Mr. Olivier is asked to leave by someone working at the Bean, but he refuses. The patrons are clearly upset by his yelling, but he continues. Siders tells one of the patrons: "Liars are going to hell, sinner. You're gonna be in hell for your life." Siders then screams at someone off camera: "There will be no water for you in hell, sinner!" Siders starts screaming at the top of his lungs: "REPENT! REPENT! REPENT!" There are small children present, and their parents are clearly disturbed by Siders. Peden then joins them, and screams at the parents of the children that they are "mocking God" and that "they are murdering babies right there" (referring to the JWHO). The man holding a small child asks them to stop harassing him, to which Peden responds, "we're trying to wake you from your stupor." The harassment goes on until the family takes the small children inside. Mr. Olivier continues to scream that "children are being murdered right here!" and Siders calls a patron a "sissy" and "effeminate." Siders continues to scream at these patrons, telling one to "SHUT UP AND LISTEN!" for around an hour, causing some to leave and others to request repeatedly that he stop harassing them. Peden at one point tells a police officer that "all of Fondren" "is wicked." At one point, Mr. Camp walks by, and Mr. Siders says to him: "Going to hell. Still on your way to hell. ... Still a child of the devil. ... Still gonna bust hell wide open. ... Because you hate God, sinner. You hate God, sinner." Siders then starts yelling about being "a fool" and having an "I.Q. of 1."

14

The Court also finds credible Mr. Camp and Ms. Kipfmiller's testimony, and it is the finding of the Court, that, on April 4, 2021, Mr. Siders spit on Mr. Camp, and that he waived his Bible in Mr. Camp's face in a physically threatening manner with the intent to instill fear in Mr. Camp of bodily harm. Mr. Siders even admitted at trial that his "preaching" was intended to instill fear, which he described as fear of God. On April 4th, he succeeded. The Court finds that on April 4, 2021, Mr. Siders intended to instill in Mr. Camp fear of imminent serious bodily harm and, in fact, caused Mr. Camp to suffer fear of imminent serious bodily harm.

The Court further finds credible Mr. Camp's testimony that Mr. Siders called him a "sissy" and "effeminate man" on April 4, despite Mr. Siders' denial. Video evidence shows Mr. Siders making those very comments to the general Fondren public. Another video shows Siders's "brother in Christ," Gabe Olivier, making the same comments to an Officer of the Jackson Police Department, which comments Siders agreed with and defended at trial. Given these facts, and given the barrage of other insults (what Mr. Siders's called Gospel) Mr. Siders admits to hurling at Mr. Camp that day (most of which are caught on video), the Court believes Mr. Camp's testimony that Mr. Siders called him a "sissy" and "effeminate man" on April 4.

The Court further finds that, by calling Ms. Kipfmiller a "Jezebel," Defendant Siders intended to insult her. Merriam-Webster's Dictionary defines "Jezebel" as, among other things, "an impudent, shameless, or morally unrestrained woman." Synonyms include "tramp" and "floozy." The Court finds not credible Mr. Siders's testimony that his reference to Ms. Kipfmiller as a Jezebel was merely intended to signal that she dominated Mr. Camp and "wore the pants" in the relationship.

The Court further finds credible Mr. Camp's testimony, and it is the finding of this Court, that on or about on or about June 3, 2021, Defendant Peden (using a voice amplification system)

15

intended to instill in Mr. Camp fear of imminent serious bodily harm and, in fact, caused Mr. Camp to suffer fear of imminent serious bodily harm upon Mr. Peden's threats directed at Mr. Camp, amplified through loudspeakers, that: "YOU'RE GONNA DIE, MATT! YOU'RE GONNA DIE AND MEET GOD ONE DAY, MATT! IT'S TIME TO REPENT, MATT! IT'S TIME TO REPENT, MATTHEW!" "IT WASN'T JUST A COINCIDENCE THAT WE'VE RUN INTO EACH OTHER SO MANY TIMES!" This is particularly true when taken together with Mr. Peden's other such actions, as caught on the videos in evidence and other testimony.

Finally, the Court finds that Defendant Campos, on or about June 23, by sending his Facebook message, intended to instill in Mr. Camp, and in fact instilled in Mr. Camp, fear of bodily harm.

### III.    DISCUSSION AND CONCLUSIONS OF LAW

**A.    Defendants Engaged in a Campaign of Fear to Intimidate and Harass Mr. Camp, part of their larger domestic terrorism operation.**

The United States Constitution's First Amendment right to free speech is sacrosanct. The Court recognizes that Defendants have a First Amendment right to peacefully protest abortion and peacefully congregate in public spaces to promote their religious beliefs. This, however, is not a case involving peaceful protest or protected speech. This case presents repeated threats specifically targeted at a particular individual—Mr. Camp—who has no connection at all with the Woman's Clinic (JWHO). Mr. Camp, a neighborhood resident wishing to peacefully walk about his own community's local businesses, has for months endured an ongoing campaign by Defendants to harass, intimidate, and terrify him. They discovered his name and home address. They began parking by his house, calling him out by name using bullhorn-like voice amplification, warning him that they came specifically for him, that he was going to die, possibly even "today," and Mr.

16

Siders waived his Bible in Mr. Camp's face causing him fear that Mr. Siders would strike him with it, while spit flew onto Mr. Camp's face. Such conduct—an ongoing campaign of threats targeting a specific person—is not speech protected by the First Amendment, it is an assault upon Mr. Camp, which is part of a broader pattern of domestic terrorism[7] inflicted upon the citizens and businesses of Fondren.

Mr. Camp's fear is justified. The terror created by the Defendants comes among a history of violent acts perpetrated by such anti-abortion extremists. Like the U.S. District Court for the Middle District of Alabama has said: "[T]his court cannot overlook the backdrop to this case: a history of severe violence against abortion providers in…the region." *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333 (M.D. Ala.), *as corrected* (Oct. 24, 2014), *supplemented*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014), and *amended*, No. 2:13-405, 2014 WL 5426891 (M.D. Ala. Oct. 24, 2014). In the preceding decades, violence from anti-abortion or religious extremists in the Southeast include: shooting, killing, and firebombing in Florida abortion clinics; arson, bombings and killing at Alabama abortions clinics, and the bombing of a Georgia abortion clinic. *Id.* "[A]bortion doctors have been murdered, other clinics have been bombed and burned, and abortion providers have endured other, less dangerous forms of extreme harassment that exceed the boundaries of peaceful protest." *Id.*

Data shows that, nationally from 1977 until around 2016, there were at least 11 murders, 26 attempted murders, and thousands of incidents of criminal activities directed at abortion providers. *Does 1-10 v. Univ. of Washington*, No. C16-1212, 2016 WL 8738682, at *6 (W.D. Wash. Nov. 15, 2016), *rev'd and remanded*, 695 F. App'x 265 (9th Cir. 2017), *order*

---

[7]    The federal government defines "domestic terrorism" as "activities that…appear to be intended to intimidate or coerce a civilian population." 18 USC 2331(5)(B)(i).

17

*reinstated*, No. 16-1212, 2020 WL 4048307 (W.D. Wash. July 20, 2020), *aff'd*, 849 F. App'x 706 (9th Cir. 2021). And the Fifth Circuit Court of Appeals, citing congressional data on abortion clinic-related violence, noted that, from 1984 through 1992, there had been "28 bombings, 62 arsons, 48 attempted bombings and arsons, 266 bomb threats, and 394 incidents of vandalism." *United States v. Bird*, 124 F.3d 667, 680 (5th Cir. 1997). Thus, historically and today, abortion clinics and their neighbors "live and work in a climate of extreme hostility to the practice of abortion." *Strange,* 33 F. Supp. 3d at 1334. Given the pressures placed on abortion clinics and climate of hostility to the practice, abortion clinics throughout the South have dwindled under pressure and fear, accomplishing the goal of these domestic terrorists. *See id.*

In Mississippi abortion is a legal medical procedure available at the state's sole remaining clinic, the JWHO in Fondren. Some are so displeased by JWHO's presence, they regularly congregate by the JWHO to protest its existence. Such protests, which have been ongoing for years and are typically confined to an area by the JWHO, are generally shielded by the First Amendment as protected speech.

Defendants, who label themselves not simply abortion protestors but "preachers," have recently undertaken a different much, more aggressive tack. The evidence shows that Defendants Siders and Peden, while originally inspired to protest the JWHO, have turned much of their focus to neighboring businesses and their patrons, using voice amplification technology to indiscriminately shriek at those unfortunate enough, for instance, to be enjoying a cup of coffee or sandwich on one of the area's outdoor patios. That any business patron would have to endure unrelenting, amplified screams of "SINNER!", "REPENT!", and "YOU'RE GOING TO HELL!" while minding their own affairs at a neighborhood business is regrettable, and may well be illegal, harassment. But when Defendants' behavior turns from indiscriminate rantings to targeted threats

18

against an individual (as it did with Mr. Camp)—learning his name, where he lives, parking by his house, telling him they came for him, that he is going to die (maybe "today"), and pointing and waiving a Bible within inches of his face in a threatening manner, while spit flew in his face — such behavior crosses the line between protected speech and criminal assault.

**B.      Defendants Siders and Peden Criminally Assaulted Mr. Camp.**

Each Defendant has been charged with simple assault in violation of Mississippi Code § 97-3-7(3)(a)(iii):

> (1)(a) "A person is guilty of simple assault if he…(iii) attempts by physical menace to put another in fear of imminent serious bodily harm… ."

As noted above, the Court finds that the Defendants Siders and Peden intended to put Mr. Camp in fear of imminent serious bodily harm, and Mr. Camp in fact feared imminent serious bodily harm. The question thus becomes whether they "physically menaced" Mr. Camp.

Mississippi defines "physical menace" as "physical action that is intended to create fear of immediate bodily harm." *McDonald v. State*, 784 So. 2d 261, 270 (Miss. Ct. App. 2001). "Physical menace demands something more than words." *Id.* at 267. Mr. Camp must have in fact feared imminent serious bodily harm. *S.B. v. State*, 566 So. 2d 1276 (Miss. 1990).

Mr. Siders physically menaced Mr. Camp on April 4, 2021. Mr. Siders, a tall, muscular, imposing man, wearing military-style attire, got in Mr. Camp's face—close enough that his spit contacted Camp—pointed at him menacingly with his finger, and waived his Bible menacingly in Mr. Camp's face, all while screaming, through a voice amplification system that Mr. Siders came for him, that he was a sissy, effeminate, that he was going to hell, and by stepping toward Mr. Camp several times, even screaming that Mr. Camp was going to die.

Mr. Peden physically menaced Mr. Camp on June 3, 2021, by using voice amplification to target and scream at Mr. Camp: "YOU'RE GONNA DIE, MATT! YOU'RE GONNA DIE AND

19

MEET GOD ONE DAY, MATT! IT'S TIME TO REPENT, MATT! IT'S TIME TO REPENT, MATTHEW!" "IT WASN'T JUST A COINCIDENCE THAT WE'VE RUN INTO EACH OTHER SO MANY TIMES!" This was not an isolated event. Mr. Peden had confronted Mr. Camp on April 4, 2021, during the confrontation by Mr. Siders, telling him "hey man, I've seen you here before" and engaging with him during Siders' confrontation.

Additionally, given the history of violence by anti-abortion extremists, it was quite reasonable for Mr. Camp to fear imminent, serious bodily harm.

**C.    Defendant Campos did Not Criminally Assault Mr. Camp.**

As for Defendant Campos, while his threat made through Facebook to the victim may well be criminal under other statutes, it is not under the statute charged (§ 97-3-7(3)(a)(iii)) because Mr. Camp could not have a reasonable fear of suffering ***imminent*** serious bodily harm from Mr. Campos' threatening Facebook messages.

**D.    The First Amendment Does Not Protect Weaponized Speech.**

The Defendants incorrectly claim their actions are protected by the First Amendment. No person may use speech allegedly religious in nature as a cudgel and then hide behind notions of "free speech." While First Amendment protections are broad, those protections do not protect face-to-face personal insults or fighting words. As noted by the Supreme Court in *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942), constitutional protection does not extend to "the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." The Court explained:

> It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

20

*Id.*

Defendants Peden and Siders intended to incite, threaten, insult, and instill fear into Mr. Camp. That is not protected speech, it is assault in violation of Mississippi Code § 97-3-7(3)(a)(iii).

Mr. Siders also insulted Mr. Camp's girlfriend, Ms. Kipfmiller, by repeatedly calling her a "Jezebel," which, as noted above, was intended to denigrate her as a "tramp." In other words, Siders sought to insult Ms. Kipfmiller and provoke Mr. Camp, much like calling people effeminate and sissies. As stated above, such insults and provocations are not protected speech.

At trial, Defendants repeatedly relied on *Snyder v. Phelps,* 562 U.S. 443 (2011), claiming its application here proscribed any possibility of a conviction. But *Phelps* is inapposite. There, the infamous Westboro Baptist Church (led by Fred Phelps) picketed the funeral of deceased military officer, Lance Corporal Matthew Snyder, displaying signs stating, for example, "God Hates the USA/Thank God for 9/11," "Thank God for Dead Soldiers," and "God Hates Fags." *Id.* at 468. The "church," who claimed it was protesting the U.S. military, notified local authorities in advance that they intended to picket the funeral, staged the picket on public land next to a public street, and complied with all police instructions. *Id.* at 448-49. The deceased's father, Albert Snyder, could see the tops of the picket signs on the day of the funeral, but could not read what was written on them and was unaware of the church's message until he saw a news story about the funeral and the picketing. *Id.* at 449. Snyder sued the church for various torts, including severe emotional distress. *Id.* at 450. In defense, the church claimed its actions were speech protected by the First Amendment. *Id.* The trial court awarded Mr. Snyder over $10 million in damages.

On appeal, the majority of the U.S. Supreme Court voted to reverse, holding that the church's actions constituted protected speech because it was speaking on "matters of public

concern," i.e., speech "relating to any matter of political, social, or other concern to the community" "or when it is a subject of general interest and of value and concern to the public." *Id.* at 451, 453. To determine whether the speech addressed matters of public concern, the Court examined the "content, form, and context" (*id.* at 453) of the speech, but noted that none of these factors determines the outcome of the case and that a court must evaluate all the circumstances of the speech, "including what was said, where it was said, and how it was said." *Id.* at 454.

The Court concluded that, although some of the picket signs could have arguably targeted the Snyders, most addressed issues about the moral conduct of the U.S., the fate of the U.S., and homosexuality in the military. *Id.* at 454. So the "overall thrust and dominant theme" of the speech related to "broader public issues." *Id.* Further, "[t]here was no pre-existing relationship or conflict between Westboro and Snyder that might suggest Westboro's speech on public matters was intended to mask an attack on Snyder over a private matter." *Id.* at 455. Therefore, the Court concluded, the church was "speaking" on matters of public concern on public property and thus was entitled to protection under the First Amendment.

Here, in contrast, Defendants Siders and Peden were not speaking on any public issue. They engaged in a pattern of harassment against Mr. Camp—a private citizen—with whom they engaged, targeted and harassed over the course of months. The Court fails to grasp how screaming through voice amplification at Mr. Camp that "YOU'RE GOING TO DIE, MATT!", LET YOUR JEZEBEL TAKE YOU AWAY! YOU WICKED DEVIL! YOU HATE GOD! GOD'S GONNA PUT YOU IN HELL!" "YOU'RE GONNA DIE! YOU WILL DIE, SINNER! YOU'RE GONNA DIE! YOU MIGHT DIE TODAY!" addresses any public concern. It does not. It served one purpose: the Defendants' intention to instill fear of serious imminent bodily harm. Even if the Court were to credit Defendants' actions as being genuinely concerned with Mr. Camp's salvation

22

(which the Court does not), the status of Mr. Camp's salvation or religious status is an immensely private matter.

The Court is further unpersuaded by Defendants' claims that their speech was purely religious. It was not. Just because one invokes the name of God or makes alleged Biblical references while engaging in a targeted assault does not provide blanket protection against criminal prosecution. Invoking one's religion does not give that person carte blanche to say and do whatever they please. Simply put, the Defendants cannot weaponize "preaching" to harass and insult an individual. Defendants insulted, threatened and harassed Mr. Camp, and their actions understandably caused Mr. Camp to fear imminent serious bodily harm. That is a crime, not religious speech.

**E.    The Court Can Rely on Evidence Beyond the Date in the Charging Document.**

During trial, Defense counsel repeatedly argued that the Court could not consider evidence from dates beyond April 4, 2021 because the charging affidavit signed by Mr. Camp alleged that Siders and Peden physically menaced him "on or about April 3, 2021." (Defense counsel agreed at trial that the City could make its case for criminal assault on April 4, 2021, but argued that evidence from any other date beyond April 4 is irrelevant and inadmissible.)

As an initial matter Mr. Siders, in fact, committed his criminal assault on April 4, 2021, so counsel's argument, even if accepted, would not change his result. The only relevant question is whether the Court can find Mr. Peden guilty for simple assault in violation of § 97-3-7(3)(a)(iii) for his acts on June 3, 2021 when the Affidavit alleges criminal acts "on or about April 3, 2021." The answer is yes.

The Court did not issue arrest warrants or set a trial based on the Affidavits. Instead, the Court, after receiving the Affidavits, determined more evidence was needed to proceed. As noted in the Comments to MRCrP. 2.2:

> The purpose of the charging affidavit, then, is to enable the judge to determine whether the "probable cause" required to support a warrant exists. The judge must judge for himself the persuasiveness of the facts relied on by a[n] [affiant] to show probable cause. The judge should not accept without question the affiant's mere conclusion that the person whose arrest is sought has committed a crime.

(Quoting *Giordenello v. United States*, 357 U.S. 480 (1958)).

The Court, requiring more evidence, set a probable cause hearing in order to determine whether there was probable cause to find that the alleged offenses had in fact been committed, not on any particular date, but at all. At the probable cause hearing, Mr. Camp testified extensively about Mr. Peden's (and Mr. Siders's) campaign of harassment from April to July 2021. Mr. Peden (like all Defendants) was represented by counsel at that hearing, and counsel lodged no objection to the scope of the evidence submitted and heard by the Court. It was on the basis of all the evidence at the probable cause hearing—not just the Affidavits or evidence from April 4th, 2021—that the Court proceeded to issue arrest warrants and set a trial on the merits. All Defendants were thus adequately informed of the charges, the evidence, and allowed to prepare all possible defenses. *See Allred v. State*, 908 So. 2d 889 (Miss. Ct. App. 2005) (held that indictment, despite its lack of specific dates for each alleged assault, adequately informed defendant that he was charged with sexual battery and allowed him to prepare any possible defense); *see also McBride v. State*, 61 So. 3d 138, 150 (Miss. 2011) (held that a two-month variance between the dates alleged in the indictment and the proof presented at trial did not cause prejudice to defendant).

Further, defense counsel lodged no objection to the City's pretrial evidentiary submissions, which included evidence demonstrating Defendants' ongoing campaign of threats spanning April to July 2021.

Finally, accompanying the Affidavits was Mr. Camp's "Complaint Intake Form," which complained of Defendants' criminal behavior extending from April to July 2021.

## VERDICT

The City of Jackson has proven beyond a reasonable doubt that Defendant Allan Siders attempted by physical menace to put Mr. Camp in fear of imminent serious bodily harm. Defendant Allan Siders is therefore GUILTY of the allegations as charged.

The City of Jackson has proven beyond a reasonable doubt that Defendant Bryan Peden attempted by physical menace to put Mr. Camp in fear of imminent serious bodily harm. Defendant Bryan Peden is therefore GUILTY of the allegations as charged.

The City of Jackson has not proven beyond a reasonable doubt that Defendant Boris Campos attempted by physical menace to put Mr. Camp in fear of imminent serious bodily harm. Defendant Boris Campos is therefore NOT GUILTY of the allegations as charged.

## SENTENCES

Given the evidence of Mr. Siders's assault of Mr. Camp, I sentence Mr. Siders to a fine of $500 and to imprisonment in the county jail for six months, to be served day for day, not to be released early without my express permission.

Given the evidence of Mr. Peden's assault of Mr. Camp, I sentence Mr. Peden to a fine of $500 and to imprisonment in the county jail for three months, to be served day for day, not to be released early without my express permission.

Defendants Siders and Peden are permanently ordered to have no contact with Mr. Camp and Ms. Kipfmiller through in-person contact, phone, email, text message, social media, or any other form of communication. Further, these Defendants are ordered to stay at least 50 yards away from Ms. Camp and Ms. Kipfmiller and to stay at least 25 yards away from where they live. This Order is not intended to bar these Defendants from legally protesting in the public areas directly adjacent to the JWHO.

## BONDS

Mr. Camp testified at the probable cause hearing that Defendants Siders and Peden are part of an organization that has a website promoting their extremist views. According to Mr. Camp, the Defendants' website has posted hundreds of videos to persons and organizations throughout the world. Such organizations could facilitate the Defendants in fleeing. Further, Mr. Siders testified he is the preacher at "The Church at Jackson," which he claims has approximately thirty members. That organization could also facilitate Defendants Siders and Peden in fleeing.

The Defendants are not living in poverty, both have two private defense attorneys representing them, one is in the landscaping business, and the other works for MDOT.

Defendant Peden testified that nothing happening in this Court matters because his sole focus is on eternity. The Court interprets that statement to mean that Defendant Peden would have no compunction about fleeing.

In addition to being a flight risk, both Defendants pose an ongoing danger to the citizens of Jackson for the many reasons stated in this opinion, including the fact that they were perfectly willing to traumatize young children by screaming insults at their parents though a voice amplifying device while only a few feet from them. This Court finds particularly troubling the fact that Mr. Siders believes that it is acceptable to scream at a police officer that he is a coward,

a sissy, and effeminate.    These Defendants, as demonstrated by their unhinged, delusional behavior, believe the law doesn't apply to them.  Well, they are wrong: the law does apply to them.

The Court sets the cost bond in this case at $2,500.  The secured Appearance Bond for each Defendant is $500,000.00.

**SO ORDERED**, this 22nd day of September 2021.

_____
MUNICIPAL COURT JUDGE