**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**GABRIEL OLIVIER**                                                                                    **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO.: 3:21-CV-00636-HTW-LGI**

**CITY OF BRANDON, MISSISSIPPI, ET AL.**                                    **DEFENDANTS**

**DEFENDANTS THE CITY OF BRANDON AND CHIEF WILLIAM**
**THOMPSON'S RESPONSE MEMORANDUM IN**
**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Gabriel Olivier's request for a preliminary injunction against Defendants the City of Brandon, Mississippi and Chief William Thompson should be denied. At issue are restrictions applicable to limited time periods before and after events held at the Brandon Amphitheater. Preliminary injunctive relief is an "extraordinary remedy" to which Olivier is not entitled in this case. *See Ibenyenwa v. Tex. Bd. of Crim. Just.*, 843 F. App'x 615, 616 (5th Cir. April 8, 2021).

What this case boils down to is Olivier's desire to have his preferred method of protest, without regard for the interests of anyone else. But that line of argument has long been rejected. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981).[1] Nor can a restriction be deemed "unconstitutionally vague" when, like here, it provides fair notice and clear enforcement standards. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000). Olivier's challenges under the First and Fourteenth Amendments are meritless.

---

[1] Or, as some courts have put it: "The Constitution does not guarantee unlimited freedom to speak on government property." *Bronx Household of Faith v. Bd. of Educ. of the City of New York, 492 F.3d* 89, 91 (2d Cir. 2007) (citing Supreme Court precedent).

## BACKGROUND

Brandon, Mississippi is located in Rankin County. William Thompson is the Chief of Police.[2] Population, according to the 2020 census, was approximately 24,547.[3]

The City owns and operates the Brandon Amphitheater ("Amphitheater"), which is located within Quarry Park, a public park within the City's corporate limits.[4] The Amphitheater is an open air outdoor venue that is primarily used for live ticketed concert events.[5] The capacity of the venue, depending on the seating/standing room configuration for a specific event, can exceed 8,500.[6] News reports note that the City's goal was to make the Amphitheater the "jewel for Central Mississippi, the heart of Brandon."[7]

The City began hosting events at the Amphitheater in 2018.[8] People come from all over the state to attend events at the Amphitheater.[9] The Amphitheater also serves as a significant source of revenue and is a major employer within the City.[10]

Since the opening of the Amphitheater, the City has engaged in a continuous review process and has made necessary adjustments to better provide for the efficient and safe flow of vehicular traffic as well as the safety of pedestrians and event attendees.[11] As part of this review and adjustment process, the City hired third-party engineering firm Neel-Schaffer to study, report on, and make recommendations regarding the vehicular and pedestrian traffic and parking

---

[2] Chief William Thompson Affidavit, Ex. 1.
[3] *See* https://worldpopulationreview.com/us-cities/brandon-ms-population (last visited Nov. 5, 2021).
[4] Ordinance, Ex. 2.
[5] *Id.*
[6] *Id.*
[7] *See* https://www.neel-schaffer.com/what-we-do/projects/brandon-amphitheater/ (last visited Nov. 5, 2021).
[8] *Id.*
[9]*See* https://www.wapt.com/article/covid-19-impact-on-brandon-amphitheater-estimated-at-dollar10-million/32700933 (last visited Nov. 5, 2021) (noting that in the first year of tracking ticket sales, tickets were sold to residents of 80 out of 82 counties in Mississippi).
[10] *Id.* (noting that the Amphitheater employs as many as 250 contract employees and the shutdown caused by COVID-19 at the beginning of 2020 had a $10 million impact on the City); *see also* https://www.wjtv.com/news/show-dates-filling-up-at-the-brandon-amphitheater/ (last visited Nov. 5, 2020) (noting the revenue the Amphitheater brings to other local businesses).
[11] Ordinance, Ex. 2.

surrounding the Amphitheater.[12]   Police officers and other City officials also reported their observations and recommendations.[13]   Based on these reports, the City determined that, on the day of an event, approximately three (3) hours before the Amphitheater is opened to the public and one (1) hour after an event is concluded, vehicular and pedestrian traffic is significant and requires the active participation of traffic control officers and other venue personnel to ensure, as reasonably practical, the safety of event attendees and the general public.[14]

The City observed that, on days of an event and during the times referenced above, individuals have engaged in public protests and demonstrations that have caused and created an unreasonable distraction and safety hazard to event attendees and to the general public traveling.[15]   Contrary to Olivier's self-serving assertions that he does not hurl insults and speaks only in a conversational tone to persons walking by,[16] the video attached as Exhibit 10 shows that, on multiple occasions, Olivier has yelled insults at pedestrians walking by, including "whore," "Jezebel," "fornicator," and "child predator."[17]   These incidents have led to altercations that distracted police officers from performing their traffic-control duties.[18]

In order to protect the health, safety, and welfare of the public, on December 19, 2019, the City amended its Code of Ordinances to include Section 50-45:

**Sec. 50-45 Designating a Protest Area and Related Provisions Regarding Public Protests/Demonstrations During Events at the Brandon Amphitheater.**

---

[12] April 23, 2018 Neel-Schaffer Report, Ex. 3; May 21, 2018 Neel-Schaffer Report, Ex. 4; June 10, 2018 Neel-Schaffer Report, Ex. 5; July 6, 2018 Neel-Schaffer Report, Ex. 6; July 27, 2018 Neel-Schaffer Report, Ex. 7.
[13] Beau Edgington Affidavit, Ex. 8.
[14] Ordinance, Ex. 2.
[15] *See generally* Verified Complaint, Doc. No. 1; Chief Thompson Affidavit, Ex. 1; Heather Perry Affidavit, Ex. 9.
[16] *See* Verified Complaint, Doc. No. 1.
[17] Hank Williams, Jr. Video, file REC_0021 at 2:12-2:28 and file REC_0023 at 7:00-7:40, Ex. 10 (in subfile 5-Boyce-Thompson-Front-ent); Fred Shanks Affidavit, Ex. 11; Bradley Turner Affidavit, Ex. 12.
[18] Hank Williams, Jr. Video, file REC_0023 at 7:00-7:40, Ex. 10 (in subfile 5-Boyce-Thompson-Front-ent); Fred Shanks Affidavit, Ex. 11; Bradley Turner Affidavit, Ex. 12.

PD.35781303.1

1.  Three (3) hours prior to the opening of the Brandon Amphitheater to event attendees for a live ticket concert event ("Event") and one (1) hour after the conclusion of the Event, individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the Restricted Area shown in Exhibit "A" attached hereto, except in the designated Protest Area as shown on Exhibit "A" attached hereto.

2.  The Protest Area is available to individuals and/or groups during the time specified in Section 1 above, without the necessity of pre-notice or permit, subject to the following terms and conditions:

(a) All individuals and/or groups shall be and remain wholly within the Protest Area while actively engaged in public protests and/or demonstrations.  Vehicles are prohibited in the Protest Area;

(b) The use of lasers, blinking or blinding lights, electric drums, or other amplified percussion or musical instruments, or equipment except as provided herein-below, is prohibited;

(c) The use of a megaphone and/or loudspeaker which is clearly audible more than 100 feet from where the Protest Area is located is prohibited;

(d) Libel, slander, obscenities, and/or speech that incites imminent violence or law breaking is prohibited;

(e) The use of ladders, step stools, tables, chairs, buckets and/or any other object or thing that is customarily used to heighten an individual from the ground is prohibited;

(f) Temporary signs are permitted; however, wooden, or metal signs or sign stakes made from hard material that may be used as a weapon are prohibited.  All signs must be hand-held and shall not be affixed to anything in the Protest Area or otherwise affixed to the Protest Area. The top of any sign may not be elevated more than 4 feet beyond the height of its holder.

(g) Anything brought onto the Protest Area shall be removed within 75 minutes of the conclusion of an Event.

(h) Each group shall have a representative who shall be present at all times while the group is, in whole or in part, within the Protest Area.  The representative shall, when reasonably requested by the Chief of Police and/or his designee, provide photo identification.  Individuals who are engaged in a demonstration and/or protest shall maintain on their possession while in the Protest Area photo identification and provide the same to the Chief of Police and/or his designee as and when reasonably

requested.  Requests for identification by the Chief of Police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

3.   In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in Section 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the Protest Area and is not be permitted to return to the Protest Area during the Event on the day of the violation and if the same individual violates the provisions herein again during an Event in the same calendar year, the individual shall be removed from the Protest Area and is not be permitted to return to the Protest Area during any Event for the remainder of that calendar year.[19]



---

[19] Ordinance, Ex. 2; December 2, 2019 Board Minutes, Ex. 13.

On May 1, 2021, Lee Brice and Parmalee held a concert at the Amphitheater. The event was scheduled to begin at 8:00 p.m.[20] The Amphitheater was opened to event attendees at 6:00 p.m.[21] At approximately 6:00 p.m., Olivier and his group, including Bryan David Peden,[22] arrived at the Amphitheater.[23]

Based on prior experience with Olivier and others in his group, it was expected that they intended to engage in protest activities at the intersection of Boyce Thompson Drive and Rock Way, which is the main entrance to the Amphitheater.[24] Chief Thompson approached Olivier and his group and asked about their knowledge of the ordinance.[25]

Olivier, the spokesperson for the group, advised that he was aware of and had read the subject ordinance.[26] In an effort to avoid any confusion, Chief Thompson provided a copy of the subject ordinance to Olivier and identified the available Protest Area.[27] At approximately 6:20 p.m., Olivier and his group proceeded toward the Protest Area, stopped well short of the area, had a discussion, and then proceeded to the sidewalk at the intersection of Boyce Thompson Drive and the western entrance of Rock Way in the designated Restricted Area.[28] At no point did Olivier or his group enter the Protest Area.[29]

Having set up in the Restricted Area, Olivier and his group then began to engage in protest activities and to initiate interactions using a voice amplification device and other tactics, distracting the officer directing pedestrian and vehicular traffic.[30] The police officer, unable to

---

[20] Chief Thompson Affidavit, Ex. 1.
[21] Id.
[22] Peden Criminal File, Ex. 14.
[23] Chief Thompson Affidavit, Ex. 1.
[24] Id.; Olivier Facebook Posts, Ex. 15.
[25] Chief Thompson Affidavit, Ex. 1.
[26] Id.; Verified Complaint, Doc. No. 1.
[27] Chief Thompson Affidavit, Ex. 1; Verified Complaint, Doc. No. 1.
[28] Chief Thompson Affidavit, Ex. 1.
[29] Id.
[30] Id.

hear police radio traffic because of the noise generated from Olivier, radioed for assistance, and Chief Thompson responded.[31]

As Chief Thompson approached Olivier and his group, he again observed that they had large poster signs,[32] were using at least one voice amplification device to single out and make inappropriate comments to and about event attendees, and were attempting to hand out literature to those attempting to pass by on the sidewalk.[33]  He observed that some in Olivier's group had body cameras or other recording devices on their persons, all conduct common to protestor groups.[34]  Chief Thompson observed that Olivier and his group were obstructing the sidewalk and that, in order to avoid Olivier and his group, pedestrians were forced to leave the sidewalk and walk around them in the public street.[35]  Chief Thompson advised Olivier and his group that they needed to relocate to the designated Protest Area to continue to protest in the Restricted Area during the restricted period.[36]

Olivier complained to Chief Thompson that forcing them to relocate would violate their right to protest.[37]  Failing to adhere to Chief Thompson's command to cease protesting in the Restricted Area and to relocate to the designated Protest Area, Olivier was arrested and charged with violating the subject ordinance.[38]

On June 23, 2021,  Olivier appeared in Brandon Municipal Court, with counsel, and entered plea of *nolo contendere* to the charge of violating the subject ordinance.  He was found guilty.[39]  Olivier did not appeal his conviction.[40]

[31] *Id.*
[32] Protestor Photos, Ex. 16.
[33] Chief Thompson Affidavit, Ex. 1.
[34] *Id.*
[35] *Id.*
[36] *Id.*; Verified Complaint, Doc. No. 1.
[37] Chief Thompson Affidavit, Ex. 1.
[38] *See* Verified Complaint, Doc. No. 1; Chief Thompson Affidavit, Ex. 1; Olivier Criminal File, Ex. 17.
[39] *See* Verified Complaint, Doc. No. 1; Criminal Affidavit, Order, & Court Abstract, Ex. 18.

PD.35781303.1

## ARGUMENT & AUTHORITIES

The conviction serves as an initial hurdle for Olivier because, under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), a § 1983 suit that "necessarily impl[ies] the invalidity" of a conviction is not cognizable unless and until the conviction is set aside. *See Hernandez v. Boles*, 184 F.3d 819 (5th Cir. 1999) (explaining that "[w]hether the conviction was obtained . . . by a nolo plea is irrelevant" to the *Heck* rule). Courts have long applied *Heck* to requests for prospective injunctive relief. *E.g., Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998) (en banc) (explaining that "the type of prospective injunctive relief that Clarke requests in this case—a facial declaration of the unconstitutionality of the [restriction in question]—is so intertwined with his request for damages . . . that a favorable ruling on the former would 'necessarily imply' the invalidity of his [prior conviction]"); *see also Eubank v. Ghee*, 202 F.3d 268 (6th Cir. 1999) ("The holding in *Heck* applies regardless of whether the plaintiff seeks injunctive or monetary relief.").

But even on the merits, preliminary injunctions are governed by a "stringent" standard. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). Under this stringent standard, "[i]njunctive relief, particularly in the preliminary stages of litigation, requires an unequivocal showing of the need for relief to issue." *See, e.g., RW Dev., L.L.C. v. Cuningham Grp. Architecture, Inc.*, 2012 WL 3258782, *2 (S.D. Miss. 2012) (emphasis added; citation omitted). Put simply, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id.* (quoting Fifth Circuit precedent).

Olivier has not come close to satisfying the stringent standard. For a preliminary injunction to issue, he "must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that [he] will suffer irreparable harm if the injunction is not granted, (3) that the

---

[40] *See generally* Verified Complaint, Doc. No. 1.

threatened injury outweighs any damage that the injunction might cause the defendant[s], and (4) that the injunction will not disserve the public interest." *See Nichols*, 532 F.3d at 372.  Olivier has not "clearly carried the burden of persuasion on all four requirements." *See Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, (5th Cir. Jan. 13, 2021).

### A. Olivier has not shown a likelihood of success on the merits.

#### i.  Free Speech

The starting point is the nature of Olivier's speech.  While the First Amendment undoubtably offers broad protection given the importance of the marketplace of ideas, not everything is protected.  Indeed, certain types of speech are categorically excluded from First Amendment protection.  One such category is "fighting words."  *See United States v. Mecham*, 950 F.3d 257, 262 (5th Cir. 2020).

 "Fighting words" encompass speech "that[,] when spoken aloud[,] instantly 'inflict injury or tend to incite an immediate breach of the peace.'"  *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 246 (6th Cir. 2015) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).  Whether speech rises to the level of "fighting words" is judged on an objective standard, i.e. whether the words "are likely to provoke the average person to retaliation[.]" *Street v. New York*, 394 U.S. 576, 592 (1969) (cleaned up).  Fighting words focus on whether speech is directed at a specific individual as opposed to a general crowd.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 432 (1992).

Here, video evidence shows that Olivier directs comments at specific individuals, calling a woman a "whore" and a man a "child predator."[41]  Such "[r]esort[s] to epithets or personal

---

[41] Hank Williams, Jr. Video, file REC_0021 at 2:12-2:28 and file REC_0023 at 7:00-7:40, Ex. 10 (in subfile 5-Boyce-Thompson-Front-ent); Heather Perry Affidavit, Ex. 9.  He also called passersby "Jezebels," "fornicators," and "drunkards."  Bradley Turner Affidavit, Ex. 12; Fred Shanks Affidavit, Ex. 11; Hank Williams, Jr. Video, file REC_0021 at 10:55-11:25, Ex. 10 (in subfile 5-Boyce-Thompson-Front-ent).  On another occasion at a different location, Olivier called a Jackson police officer a "sissy," a "coward," "effeminate," and told him he needed "to get

abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Cantwell v. Connecticut*, 310 U.S. 296, 309-10 (1940).  These videoed instances in fact caused a disturbance that would have resulted in violence had law enforcement not intervened.[42]

As other courts have recognized, one "need not indulge in any excessive mental gymnastics to imagine a situation where directly referencing individual women as 'dressed like tramps, whores and prostitutes' at a public event could 'provoke violent retaliation and thereby cause a breach of the peace.'"  *See Cranford v. Kluttz*, 278 F. Supp. 3d 848, 872 (M.D.N.C. 2017).  The Fifth Circuit, for example, recognized this principle in *Roy v. City of Monroe*, 950 F.3d 245, 248 (5th Cir. 2020), when it rejected a probable-cause challenge to a disturbing the peace charge involving a man who "preach[ed] against 'whores, 'drunkards,' and wayward others who frequent bars."  Mississippi state courts similarly have criminalized words and gestures that tend to incite violence.  *See Sendelweck v. State*, 101 So. 3d 734 (Miss. Ct. App. 2012) (finding probable cause to arrest for disorderly conduct, where defendant irately pointed at officer while yelling, cursing, and refusing to step back when directed); *Odem v. State*, 881 So. 2d 940 (Miss. Ct. App. 2004) (en banc) (finding probable cause to arrest for disorderly conduct, where defendant directed curse words at a deputy and engaged in combative conduct).  The bottom line is that Olivier cannot re-cast his fighting words as "protected speech."[43]

---

some baritone in his voice."  *City of Jackson v. Peden, et al.*; No. 21073492 (Jackson Municipal Court) Opinion and Verdict at pp.11-12 (Sept. 22, 2021), Ex. 19.

[42] Hank Williams, Jr. Video, file REC_0023 at 7:00-7:40, Ex. 10 (in subfile 5-Boyce-Thompson-Front-ent); Heather Perry Affidavit, Ex. 9; Fred Shanks Affidavit, Ex. 11; Bradley Turner Affidavit, Ex. 12.

[43] To the extent Olivier engages in a mix of protected and unprotected speech, the unprotected speech independently defeats any "as applied" argument that he presses.  *See, e.g., United States v. Petras,* 879 F.3d 155, 166 n.18 (5th Cir. 2018) (rejecting "as applied" challenge under the First Amendment, where there was "a mix of profane and non-profane statements").

But even to the extent that Olivier's speech is protected, it is not immune from regulation. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799 (1985) ("Even protected speech is not equally permissible in all places and at all times."). Indeed, "reasonable time, place, or manner restrictions . . . are constitutionally acceptable." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984). When, as here, a plaintiff challenges such restrictions, the <u>location</u> where the speech occurs dictates the level of scrutiny to be applied. *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 757 (5th Cir. 2010).

Though sidewalks such as those in front of the Amphitheater are generally considered "traditional public forums," such forums may be converted to "limited public forums" when they are "opened for public expression of particular kinds or by particular groups." *See Freedom from Religion Found., Inc. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020). The difference is that content-neutral restrictions in the former are subject to intermediate scrutiny while the same restrictions in the latter are subject only to a reasonableness standard. *Id*. at 426-27. Defendants will explain in this brief why intermediate scrutiny is easily satisfied, although they expressly preserve the issue of "reasonableness" should this Court deem that standard more appropriate.[44]

Application of intermediate scrutiny is underscored by two seminal Supreme Court cases. In *Ward v. Rock Against Racism*, the Supreme Court upheld a licensing restriction on sound amplification in a city park as a permissible time, place, or manner restriction. *See* 491 U.S. 781,

---

[44] The Amphitheater was opened as an entertainment venue featuring live, ticketed performances. It is not generally open to the public—audience members can only get into a certain show by purchasing a ticket to that show through the Box Office or a third-party vendor such as Ticketmaster. *See* FAQ topics "Admission" and "Ticketing," https://www.brandonamphitheater.com/the-venue/faq/#8270603628800-rwmq7je0-fcdd (last visited Nov. 5, 2021). During events, the sidewalks and roads in front of the Amphitheater are primarily used for Amphitheater traffic. Because of the limited expressive nature of the Amphitheater and the necessity of the roads and sidewalks to promote its purpose, the roads and sidewalks directly in front of the Amphitheater (in the Restricted Area) are temporarily converted to a limited public forum during these events.

The government may restrict speech in a limited public forum as long as it does not engage in viewpoint discrimination and the restriction is "reasonable in light of the purpose served by the forum." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001). It cannot be argued that a restriction tailored to making sure paying patrons safely and efficiently enter the Amphitheater is unreasonable.

803 (1989) ("The city's sound-amplification guideline is narrowly tailored to serve the substantial and content-neutral governmental interests of avoiding excessive sound volume and providing sufficient amplification within the bandshell concert ground, and the guideline leaves open ample channels of communication.  Accordingly, it is valid under the First Amendment as a reasonable regulation of the place and manner of expression.").  Similarly, in *Heffron*,[45] the Supreme Court upheld a rule requiring solicitation in a public fairground to take place only at assigned booths as a permissible time, place, or manner restriction.  *See* 452 U.S. at 654 (1981) ("[W]e hold that the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest.").  These precedents highlight the deference given to the restrictions at issue in this case.  *See, e.g., Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1361 (11th Cir. 1999) (characterizing the time, place, and manner test as a "deferential" standard); *see also Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.*, 973 F.2d 1255, 1261 (5th Cir. 1992) (Politz, J., dissenting) (acknowledging that content-neutral time, place, and manner restrictions are "accorded . . . deferential review").

Under the intermediate scrutiny test, this Court must ask three questions: (1) whether the ordinance is content neutral; (2) whether the ordinance is narrowly tailored to serve a significant government interest; and (3) whether the ordinance leaves open ample alternative channels of communication?  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  The answer to each is "yes."

---

[45] Sometimes litigants attempt to characterize *Heffron* as a "limited public forum" case, but courts have long explained that the Supreme Court applied intermediate scrutiny.  *See, e.g., Sprague v. Carter,* 848 F.2d 1243 (9th Cir. 1988) ("The Court analyzed the rule as a time, place and manner restriction[,]" and held that "[s]uch restrictions are valid 'provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information.'").

*Content Neutral.*  The ordinance is content neutral.  According to the Supreme Court, a prohibition is content neutral if it "places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker."  *See Hill*, 530 U.S. at 723.

The threshold question is whether the ordinance is facially content neutral.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015).  This facial inquiry looks only at the text of the ordinance—without considering any underlying justifications—to determine whether the ordinance impermissibly restricts or subjects to differential treatment a certain subject matter or viewpoint.  *Id.* at 167-69.

The limitation placed on "protests" and "demonstrations" has nothing whatsoever to do with the substance of Olivier's message.  It is not, as Olivier argues, a regulation of his speech; it is instead a "regulation of the places where some speech may occur."  *Hill*, 530 U.S. at 719.  The ordinance provides that "individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the restricted area . . . except in the designated protest area" during the Restricted Time.[46]

No distinction is drawn based on viewpoint or subject matter.  *See Frisby v. Schultz*, 487 U.S. at 474, 481-82 (1988) (finding a municipal ordinance prohibiting all picketing near a residence to be content-neutral because the government did not have to look at the content to determine where picketers could demonstrate); *DA Mort., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266-69 (11th Cir. 2007) (finding noise ordinance constitutional, where ordinance did not disallow certain noises because of "particular viewpoints").   On its face, the ordinance states that it applies notwithstanding the content and/or expression of the speech.  Olivier cannot satisfy his burden by merely complaining that his speech falls within the ambit of rules that he opposes,

---

[46] Ordinance, Ex. 2 (emphasis added).

for the Constitution only requires that the rules be applied evenhandedly. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the [prohibition] covered people with a particular viewpoint does not itself render the [prohibition] content or viewpoint based.").

Given the facial neutrality of the ordinance, two considerations remain:  (1) whether the ordinance "cannot be justified without reference to the content of the regulated speech[]" and (2) whether the ordinance "w[as] adopted because of disagreement with the message the speech conveys." *See Reed*, 576 U.S. at 164 (cleaned up).  The answer to both is <u>no</u>.

With respect to the first, the ordinance does not draw distinctions on account of the content of the speech and can be justified without reference to the content of the speech.  Far from singling out and distinguishing certain types of speech because of content, the subject ordinance applies equally to any form of protest or demonstration.  The requirement that one protesting in the Restricted Area during the restricted time do so in the Protest Area is not the result of the content of Olivier's speech but rather the <u>manner</u> of his speech. Protesting and demonstrating involve the proactive solicitation of an audience. The City does not permit protestors or demonstrators—irrespective of their mission or message—to engage in such conduct during a limited time within the Restricted Area except in the designated Protest Area.[47] They are free to do so in the Protest Area and also free to do so outside of the Restricted Area.[48]

Olivier claims the ordinance is content-based because, by regulating "protests," the content of the speech necessarily must be judged to determine if the speech constitutes a "protest."[49]  But the Supreme Court rejected this exact argument in *Hill*, 530 U.S. 703.   The Court noted that it has never been held, "or suggested, that it is improper to look at the content of

---

[47] *Id.*
[48] *Id.*
[49] Doc. No. 4 at pp.11-12.

- 14 -

an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Id.* at 721. Since *Reed*, courts have regularly found similar statutes to be content neutral. *See O'Connell v. City of New Bern, N.C.*, 447 F. Supp. 3d 466 (E.D.N.C. 2020) (finding restrictions on picketers content neutral); *Bruni v. City of Pitt.*, 941 F.3d 73 (3d Cir. 2019) (finding ordinance that restricted "congregating," "patrolling," "picketing," or "demonstrating" in a specified zone was content neutral); *Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017) (finding ordinance limiting where picketing and protesting activities could occur content neutral).[50]

The ordinance, simply put, does not discriminate based on the beliefs or viewpoint of the speaker but instead restricts all protests and demonstrations. As in *Hill*, "[t]hat is the level of neutrality that the Constitution demands." 530 U.S. at 725.

With respect to the second, there is no evidence that the ordinance was adopted "because of disagreement with the message [Olivier's] speech conveys." *Reed*, 576 U.S. at 164. Olivier has submitted no evidence that the City disfavors Christianity or religious speech or that it adopted the ordinance in order to target evangelical Christians or other religious speakers. Such evidence does not exist because the City is historically friendly to religion. The only evidence in the record is that the ordinance was adopted for the sole purpose of protecting the public.[51]

Olivier has not alleged that the subject ordinance has been applied differently to groups and individuals that appear in the Restricted Area to protest and/or demonstrate regardless of whatever that message may be. Such an allegation would be insupportable. In short, the City's

---

[50] While *Reed* addressed content-neutrality in a somewhat new way, courts have made clear that it did not overrule *Hill*. *See, e.g., Bruni*, 941 F.3d at 87 n.17 (collecting cases on this point.) In fact, as the Fifth Circuit has explained, lower courts are not to try and "read tea leaves" about Supreme Court cases; Supreme Court cases remain binding unless and until the High Court does away with them. *Cf. United States v. Guerrero*, 768 F.3d 351, 361 (5th Cir. 2014) ("In determining the effect of Supreme Court developments on our precedents, we do not read tea leaves to predict possible future Supreme Court rulings, but only decide whether an issued Supreme Court decision has 'unequivocally' overruled our precedent.").

[51] Ordinance, Ex. 2; Beau Edgington Affidavit, Ex. 8.

ordinance does not "single[ ] out specific subject matter for differential treatment." *See Reed*, 576 U.S. at 169 (rejecting regulation because different categories of speech were carefully parsed and assigned different rules depending on their content; here, no distinctions are made and all are given the same treatment).

Ultimately, Olivier has not met his burden of demonstrating a clear likelihood that the City's policy is content based. And this is significant because content neutrality is "the most important factor" under the governing test. *See Clarkson v. Town of Florence*, 198 F. Supp. 2d 997, 1005 (E.D. Wis. 2002). As one Fifth Circuit jurist recently reminded, "content-neutral rules typically survive First Amendment challenge." *See Doe v. Mckesson*, 947 F.3d 874, 877 (5th Cir. 2020) (Ho, J., concurring).

*Narrowly Tailored To A Significant Governmental Purpose.* The ordinance also is narrowly tailored to serve significant governmental interests. *See Ward*, 491 U.S. at 791. So "long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." *See SEIU, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010).[52]

There can be no doubt that the City has a significant interest in public safety. Again, the Supreme Court in *Heffron* previously held that similar restrictions are constitutional speech limitations that pass the second prong of the time, place, or manner test. *See* 452 U.S. at 654 (confining group to certain location).

Post-*Ward* and post-*Heffron*, federal courts have held location restrictions to be the prototypical type of limitations that pass constitutional muster. In *Ross v. Early*, 746 F.3d 546,

---

[52] In this vein, the Supreme Court has warned that, in the context of determining whether the restriction supports the interest, courts must be cautious in second-guessing the city's judgment. *See United States v. Albertini*, 472 U.S. 675, 689 (1985) ("The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.").

558 (4th Cir. 2014), for example, the Fourth Circuit acknowledged that a policy's "limited proscription on the locale of expressive activities" was a permissible time, place, and manner restriction that was "narrowly tailored to address threats to sidewalk congestion and public safety." In another example, *Hynes v. Metro. Gov't of Nashville & Davidson Cty.*, 667 F.2d 549, 550 (6th Cir. 1982), the Sixth Circuit explained that a Tennessee State Fair rule "prohibiting literature distribution" beyond "the confines of a booth or display" was a constitutional time, place, or manner restriction that was "need[ed] to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair."

Public safety is not only a substantial government interest, but a compelling one "at the heart of government's function." *Hous. Chron. Publ'g*, 488 F.3d at 622 (citing *Int'l Soc'y for Krishna Consciousness v. City of Baton Rouge*, 876 F.2d 494, 496 (5th Cir. 1989)). Here, the ordinance is justified due to public safety. During the restricted time, the Restricted Area is often crowded, so it does not allow activities that could pose a potential safety issue or obstruct the flow of pedestrian traffic.[53] This area is carefully and deliberately designed to funnel crowds of pedestrians to the main entrance of the Amphitheater and to allow for the safe and free flow of vehicular traffic and emergency vehicles.[54]

Protests and demonstrations at this intersection during the Restricted Period disrupt the flow of event attendees by blocking sidewalks, forcing pedestrians to walk in the roadways. They also cause operational problems for public-safety personnel, which in turn creates safety issues when pedestrians cannot hear officer commands to stop or walk and officers cannot hear

---

[53] Ordinance, Ex. 2; Chief Thompson Affidavit, Ex. 1.
[54] *See* Ordinance, Ex. 2; Beau Edgington Affidavit, Ex. 8 ("[I]t was determined that for purposes of safety and free and easy flow of the crowd and traffic that there was a need to implement certain restrictions where protestors could locate.").

- 17 -

radio commands letting them know when traffic is stopped and when it is flowing.[55]  Because public safety is not only a significant interest but a compelling one, the City has adequately identified an interest in support of its ordinance requiring those who wish to set up at this location to engage in expressive conduct to move to the designated protest area as described. *McCullen v. Coakley*, 573 U.S. 464, 486-87 (2014) (The City's interests in "ensuring public safety and order" and "promoting the free flow of traffic on streets and sidewalks" are legitimate, significant governmental interests.).

Countless cases demonstrate that the just-referenced governmental interests are "significant." *See Herridge v. Montgomery Cty., Tex.*, 2021 WL 1550344, *6 (S.D. Tex. Apr. 20, 2021); *Hulbert v. Pope*, __ F. Supp. 3d __, 2021 WL 1599219, *6 (D. Md. May 24, 2021) (There is "no doubt" that municipalities have a "significant interest in maintaining the safety, order, and accessibility of its streets and sidewalks." (cleaned up)); *Ross*, 746 F.3d at 556 (upholding designated area for protesters because "sidewalks surrounding the Arena suffered from severe congestion during performances of the Circus and . . . the presence of protestors caused a significant safety hazard); *Heffron*, 452 U.S. at 650 (explaining that "it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective"); *Spingola v. Vill. of Granville*, 39 F. App'x 978, 983-84 (6th Cir. 2002) (upholding ordinance limiting public speakers to designated areas during special events "to increase public safety during the festival; to ensure smooth traffic flow; and to balance free speech with the rights of persons attending the festival to be free from hindrance"); *One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1013 (9th Cir. 1996) (explaining that "cities have a substantial interest in assuring safe and convenient circulation on their streets"); *Hynes*, 667 F.2d at 550 (upholding literature distribution restriction that "confine[d]

---

[55] Ordinance, Ex. 2; Chief Thompson Affidavit, Ex. 1.

[distribution to] a booth or display" because it was "need[ed] to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair"); *Marcavage v. City of New York*, 918 F. Supp. 2d 266, 271 (S.D.N.Y. 2013) ("the City has a significant interest in protecting the health, safety and welfare of its inhabitants from the potential dangers of sound amplifiers, including the possibility of amplifiers diverting the attention of pedestrians"); *Price v. City of Fayetteville, N.C.*, 2013 WL 1751391, *5-6 (E.D.N.C. 2013) (holding government's interest "in maintaining orderly movement of Festival attendees" was sufficient to support literature distribution limitation).

The attached declarations also demonstrate <u>why</u> the rules in question address the governmental concerns involved, specifically describing the traffic at the Amphitheater during the restricted period and the safety concerns caused by the heavy traffic.[56]  Of course the City "need not wait for misfortune to strike to demonstrate [that] the [restrictions] addresses legitimate governmental interests[.]"  *See Sun–Sentinel Co. v. City of Hollywood*, 274 F. Supp. 2d 1323, 1331 (S.D. Fla. 2003) (citation omitted); *see also Watkins v. City of Arlington*, 2014 WL 3408040, *7 (N.D. Tex. 2014) ("Arlington need not wait for accidents to justify safety regulations[.]").

Allowing anyone and everyone to protest freely along the sidewalks outside of the Amphitheater presents "real harms" that the restrictions address "in a direct and material way." *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) (applying narrow tailoring requirement).  To borrow the words of a Florida district court, "[i]t requires neither towering intellect nor an expensive 'expert' study to conclude" that limitations must be placed on certain activities during events held at the Amphitheater. *See News & Sun–Sentinel Co. v. Cox*, 702 F.

---

[56] Chief Thompson Affidavit, Ex. 1; Beau Edgington Affidavit, Ex. 8; Fred Shanks Affidavit, Ex. 11; Bradley Turner Affidavit, Ex. 12.

Supp. 891, 900 (S.D. Fla. 1988) (citation omitted); *see also Burson v. Freeman*, 504 U.S. 191, 211 (1992) (explaining that "simple common sense" dictates "that some restricted zone around polling places is necessary to protect" voters from intimidation).

The videos attached as Exhibit 20 show what the vehicular and pedestrian traffic looks like during peak times prior to an event at the Amphitheater.[57]   Consider what would happen if all patrons were permitted to do what Olivier wants to do.  *See Heffron*, 452 U.S. at 654 (explaining that "the inquiry must involve not only [the plaintiff], but also all other [individuals] that would be entitled to" engage in the same activity).  In other words, aggregation is key.

If everyone was allowed to use their own amplification devices throughout the Restricted Area, and if everyone was allowed to block the sidewalks inside of the Restricted Area and hurl insults at other patrons, chaos would ensue.  Patrons would be forced to dodge loud noises and protesters throughout the Restricted Area.  This would force many patrons to walk on streets that are already heavy with vehicular traffic.  Given the inconvenience of having to do so, many disruptive confrontations could result, which would further distract law enforcement personnel from performing their traffic-control duties.  The noise amplification devices, when used at the main entrance into the Amphitheater, also prevent police officers from hearing radio traffic and pedestrians from hearing officers' orders.[58] If everyone at the Amphitheater had noise amplification devices, the safety measures in place would be futile.

Moreover, courts have found restrictions support an important governmental interest when they are designed to protect a "captive audience" from unwanted speech.  *See Phelps-Roper v. Strickland*, 539 F.3d 356, 362-66 (6th Cir. 2008); *Hill*, 530 U.S. at 716-18.   "[T]he

---

[57] Earth, Wind, and Fire Video at Disc 1, video beginning at time 18:45:20.0 (3rd video on player) and Disc 2 videos beginning at time 19:27:07.0 and 20:08:54 (videos 1 and 2 on player), Ex. 20.  (The player is labeled AutoPlay.exe in each disc subfile.).
[58] Chief Thompson Affidavit, Ex. 1; Fred Shanks Affidavit, Ex. 11; Bradley Turner Affidavit, Ex. 12.

protection afforded to offensive speech does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it. *Hill*, 530 U.S. at 716. Rejecting the protesters' arguments that funeral attendance is voluntary and mourners can simply avert their eyes to avoid the undesired communication, the Sixth Circuit held that mourners have a "personal stake" in mourning their deceased. *Strickland*, 539 F.3d at 366. And neither could "attendees simply 'avert their eyes' to avoid exposure to disruptive speech at a funeral or burial service [because] [t]he mere presence of a protestor is sufficient to inflict the harm." *Id.*

So too here. Attendees have a personal stake in attending the Amphitheater because they have paid money, sometimes in a significant amount, to attend the event. Many times, concertgoers have also traveled great distances to attend an event as well,[59] so they cannot simply turn around and go home upon seeing or hearing the unwanted communication. And there is nowhere to go to escape the unwanted communication since the protesters, while stationed at the corner of Boyce Thompson Drive and Rock Way, can be heard all the way to the front gate of the Amphitheater.

All of these consequences support the City's position because the Supreme Court has made clear that the validity of restriction "depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *See Ward*, 491 U.S. at 801.

The City has an overarching interest in promoting the success of its businesses and local events, such as events held at the Amphitheater. The Amphitheater draws crowds from all over

---

[59] *See* https://www.wapt.com/article/covid-19-impact-on-brandon-amphitheater-estimated-at-dollar10-million/32700933 (last visited Nov. 5, 2021) (noting that when first tracked, tickets to shows at the Amphitheater were sold to residents of 80 out of 82 counties in Mississippi).

PD.35781303.1

the state and is a significant source of revenue both for the City and local businesses.[60]  Allowing Olivier to jeopardize the future viability of these events by protesting, blocking pedestrian walkways, and hurling insults at innocent passersby using sound amplification within the Restricted Area places his interests above those of the City, the Amphitheater, the talent, the police officers working the events, and all citizens who have paid and wish to enjoy these events. Again, the Constitution does not require that Olivier be given such preferential treatment.  *See Startzell v. City of Phila.*, 533 F.3d 183, 198 (3d Cir. 2008) (explaining that the plaintiff's "rights are not superior to the First Amendment rights of" others).

There is no requirement that the City's rules be the perfect solution for its articulated interests.  It is settled that, to satisfy the narrow tailoring test, the government need not prove that the challenged rules are the least intrusive means of promoting the  interests involved.  *See Ward*, 491 U.S. at 798-99.  It cannot reasonably be argued that the location restriction is an ineffective way of promoting the City's interests,[61] especially since police officials have observed that, both before and after the passing of the ordinance, at events where no protesters were located inside of the Restricted Area, pedestrian and vehicular traffic flowed smoothly and without interruption.[62] *See One World One Family Now*, 76 F.3d at 1014 n.9 (explaining that it was enough that the restriction was "a 'valuable, but perhaps imperfect' means of addressing the targeted problem"); *Herridge*, 2021 WL 1550344, at *7 ("These facts all indicate that the policy is narrowly tailored to the risk that any stoppage of the flow of pedestrians or vehicles, or any crowds congregating

---

[60] *Id.*; *see also* https://www.wjtv.com/news/show-dates-filling-up-at-the-brandon-amphitheater/ (last visited Nov. 5, 2021).
[61] In fact, Olivier doesn't contest this.  In his memorandum, Olivier states that the only interests that could be legitimate are "concerns over congestion, obstruction, or perhaps excessive noise concerns" but complains that these concerns are not in the body of the ordinance and go too far as it bars leafletting, sign displays, and expressive attire. Doc. No. 4 at pp.13-14.  Both statements are false.  The preamble to the ordinance clearly states that the ordinance was passed to protect the "health, safety, and welfare of the public" due to traffic-safety issues caused by the protesters.  The ordinance also does not restrict leafletting or expressive attire, and only bans signs on poles that could be used as weapons.  Ordinance, Ex. 2.
[62] Beau Edgington Affidavit, Ex. 8.

anywhere in the restricted areas, could cause pedestrians to spill out into the street and create a public safety issue." (cleaned up)).

What's more is that the restriction is limited both geographically and temporally. The ordinance applies to a specific location—parking lots, sidewalks, busy intersections and parking lot entrances immediately in front of the Amphitheater—during a limited period of time—from three hours prior to an event until one hour after an event.[63]  Such limitations "serve to tailor the [ordinance] only to expressive activity that is likely to cause pedestrians to stop, and only at times that such stopping could pose significant risks to public safety." *Id.*  Nor are there prior restraints.  Protestors are not required to get a permit, they do not have to pay a fee, and they do not even have to identify themselves.[64]  Simply put, "[t]he policy does not burden substantially more speech than necessary to achieve its goals of ensuring that pedestrian and vehicular traffic keep moving safely in the area around the [Amphitheater] during a large event, and that goal would be 'achieved less effectively absent the [ordinance].'"  *Id.*

Olivier argues that City's "ban on constitutionally protected expression goes far beyond the requisite scope."[65]  But this argument rests on an incorrect characterization of the City's ordinance as "a ban on every form of religious expression."[66]  The evidence before the Court shows that the ordinance prevents <u>only</u> protesting and demonstrating within the Restricted Area during the restricted time.[67]

It is wrong for Olivier to contend that the City "disallows [him] from using any conceivable means of communication to convey his message on public sidewalks."[68]  To the

---

[63] Ordinance, Ex. 2.
[64] *Id.*; Although they are required to carry identification, they are only required to produce it upon request after an observed violation of the ordinance. *Id.*
[65] Doc. No. 4 at p.13.
[66] *Id.* at p.15.
[67] Ordinance, Ex. 2.
[68] Doc. No. 4 at p.13.

Case 3:21-cv-00636-HTW-LGI    Document 16    Filed 11/10/21    Page 24 of 33

contrary, within the Protest Area, the ordinance expressly permits the use of signage, expressive clothing, loudspeakers, megaphones, and the distribution of literature.

Ultimately, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *See Knights of the Ku Klux Klan v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1124 (5th Cir. 1978). Allowing unmoored protesting that interferes with vehicular and pedestrian traffic and police-protection duties is incompatible with the purpose of providing a safe entertainment venue.

*Alternative Channels.* The ordinance leaves Olivier with ample alternative channels of communication. *See Ward*, 491 U.S. at 791. "[T]he alternative forum for communication does not have to be the speaker's first choice." *See Sonnier v. Crain*, 2012 WL 6020123, *2 (E.D. La. 2012). Nor does the alternative forum for communication have to be "one that provides the same audience or impact for the speech." *See Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) (citing *Ward*, 491 U.S. at 802). These inadequate arguments are the only disadvantages Olivier possibly can point to in support of his injunction request. *E.g., Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990) ("In considering whether a regulation leaves open ample alternative channels of communication, the [Supreme] Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area or to a limited time frame.").

The touchstone of whether the alternative space for communication is sufficient is whether the speaker can reach a similar audience. *Heffron*, 452 U.S. at 655. The audience which Olivier wants to reach are people attending concerts and other events at the Amphitheater.[69] Although Olivier complains that he cannot do so effectively from the Protest Area, most of his arguments are demonstrably false. For example, Olivier complains that no one passes by the

---

[69] Verified Complaint, Doc. No. 1.

PD.35781303.1

Protest Area.[70]  But the majority of people attending the Amphitheater park in Parking Lot B.[71] Parking Lot B has two passageways for people to get to the Amphitheater—one at the intersection at Boyce Thompson Drive where Olivier wishes to stand and the other near the protest area.[72]  Coming from this second location, people either walk on the sidewalk directly across the street from the Protest Area, where they can see the signs, hear the amplification, and read the shirts, or cross at a police-monitored crosswalk near the Protest Area, meaning they walk directly in front of the protesters.[73]  Much of the vehicular traffic along Boyce Thompson Drive also passes by the Protest Area.[74]  He also complains that the Protest Area is too small for his group.[75]  The Protest Area is 15 feet 6 inches by 29 feet, which is larger than the area where Olivier wishes to protest.[76]

Olivier also incorrectly argues that the amplification restriction means no one can hear his message.[77]  But the sidewalk directly across Boyce Thompson Drive is approximately 39 feet away from the Protest Area, meaning anyone crossing the street can hear Olivier's message.[78] Olivier also argues that the closest parking spaces are over 10 feet away from the Protest Area, and no one parks there because the parking spots were "furthest in the lot from the amphitheater."[79]  The maps and picture attached as Exhibits 1,[80] 2, 21[81] clearly show there are parking spots right beside the Protest Area, the Protest Area is located near the middle of Parking

---

[70] *See* Verified Complaint, Doc. No. 1; Doc. No. 3-1.
[71] *See* July 27, 2018 Neel-Schaffer Report at p.14, Ex. 7.
[72] Beau Edgington Affidavit, Ex. 8.
[73] *Id.*
[74] *Id.*
[75] *See* Verified Complaint, Doc. No. 1; Doc. No. 3-1.
[76] *Compare* Ordinance Map, Ex. 2 *with* Ex. C to Chief Thompson Affidavit at p.9, Ex. 1.
[77] *See* Verified Complaint, Doc. No. 1; Doc. No. 3-1 at p.8.
[78] Beau Edgington Affidavit, Ex. 8.
[79] Doc. No. 3-1 at pp.7-8.
[80] *See* Ex. C to Chief Thompson Affidavit, Ex. 1, at pp.4-5.
[81] Traffic Protocol, Ex. 21.

Lot A, and officers try to fill the general-public Box Office Lot and Parking Lot A prior to allowing significant traffic into the other parking lots.[82]

Olivier blatantly ignores that he can protest, demonstrate, preach, speak, evangelize, etc. anywhere outside of the Restricted Area in any way that he chooses.[83]  Areas outside of the Restricted Area are not subject to any of the restrictions of the Protest Area.[84]  This includes almost all of Parking Lot B, where most people coming to events park, the entrance and entirety of Parking Lot E, and the corner of Boyce Thompson and Marquette Road, where many people park and walk to the Amphitheater.[85]  Olivier could also leave his written literature on cars in Parking Lots B and E, and those parked along Marquette Road.[86]  Olivier could reach as many people at any of these locations as he could standing at his desired intersection.[87]

There are plainly effective, alternative avenues for Olivier to promote his message both at and near the Amphitheater.  "In the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication."  *See Menotti v. City of Seattle*, 409 F.3d 1113, 1141 (9th Cir. 2005) (citing *City of Renton v. Playtime Theatres*, 475 U.S. 41, 54 (1986)). Olivier has available to him far <u>more</u> than what is constitutionally required.

\* \* \* \*

---

[82] Beau Edgington Affidavit, Ex. 8.

[83] *E.g.*, Ordinance, Ex. 2.

[84] *Id.*

[85] *Compare* Ordinance Map, Ex. 2 *with* July 27, 2018 Neel Schaffer Report at pp.6, 14, Ex. 7.

[86] *E.g.*, Ordinance Map, Ex. 2.

[87] During the first four concerts, 4,504 pedestrians walked to the Amphitheater from Marquette Road, and during the first five concerts, 3,402 cars parked in Parking Lot B and an additional 757 cars parked in Parking Lot E.  Parking Lot E was not open during the first two concerts.  *See* July 27, 2018 Neel-Schaffer Report at pp.6, 14, Ex. 7.  It is also important to note that, due to a walkway that runs from near the intersection at Marquette Road and Boyce Thompson Drive to the entrance gate of the Amphitheater, none of the pedestrian traffic from Marquette Road would ever reach Olivier at his desired location.

The restrictions at issue satisfy the time, place, or manner test – that is, they are content-neutral, narrowly tailored to serve an important government interests, and preserve ample alternative channels of communication. *See Ward*, 491 U.S. at 791. Consequently, the restrictions are compatible with the First Amendment.

### ii.    Due Process

Olivier wants this Court to believe that his conduct was intended as neither a protest nor a demonstration.[88] But that argument would impermissibly require this Court to reconsider his criminal conviction, again implicating *Heck v. Humphrey*, 517 U.S. 477. To be sure, Olivier pled no contest to and was convicted of violating § 50-45 by "engaging in a public protest/demonstration during the restricted time period within the restricted area near the Brandon Amphitheater."[89] Because Olivier did not appeal his conviction and it remains intact, his argument in this Court that he was not "protesting" or "demonstrating" is barred.

But even if Olivier was not *Heck*-barred, his arguments still miss the mark. "A statute can be impermissibly vague for either of two independent reasons[:]" (1) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. Neither applies here.

The words "protest" and "demonstration" are defined by Webster's Dictionary to mean, respectively, "an event at which people gather together to show strong disapproval about something" and "a public display of group feelings toward a person or cause."[90] As the Supreme Court held in *Hill*, "[t]he likelihood that anyone would not understand any of those common

---

[88] *See* Doc. No. 4 at p.18.
[89] Affidavit and Order, Ex. 18.
[90] *Protest*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/protest (last visited Nov. 3, 2021); *Demonstration*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/demonstration (last visited Nov. 3, 2021).

words seems quite remote."  530 U.S. at 732.

Olivier attempts to recast the generally accepted use of the words "protest" and "demonstration" to contend that he was without reasonable notice.  Yet Olivier ignores that he described what he was doing as a protest and fails to acknowledge that, prior to his arrest, Chief Thompson provided specific assurances to him that his conduct would in fact fall within the parameters of the subject ordinance and that he was given an opportunity to avoid arrest and relocate to the designated Protest Area, but he refused.[91]    Only then was he arrested.[92]

Plus, as generally described in the complaint and shown in the record evidence, Olivier and others had previously and on the day at issue conveyed a message of strong disapproval about drunkenness, sin, and abortion; singled out individuals with whom they perceived disagreement; and publicly shamed and humiliated them.[93]  Olivier simply cannot show that the City has interpreted the subject ordinance to permit or allow others to engage in the same or similar conduct.

The ordinance at issue is very different from policies that have been struck down under the unbridled-discretion doctrine. Impermissible policies base the prohibition of speech on vague criteria that necessarily require the permitting authority to make some judgment about the content or viewpoint of the speech. *See, e.g., Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 149–50 (1969) (striking down policy limiting public demonstrations on city streets to only those that benefit "public welfare, peace, safety, health, decency, good order, morals or convenience"). Or, they provide no criteria whatsoever, leaving the decision up to the caprice of a government employee. *See, e.g., Toga Soc'y, Inc. v. Lee*, 323 F. Supp. 2d 779, 792 (E.D. La.

---

[91] Verified Complaint, Doc. No. 1; Affidavit and Order, Ex. 18; Chief Thompson Affidavit, Ex. 1.
[92] Verified Complaint, Doc. No. 1; Chief Thompson Affidavit, Ex. 1.
[93] *See* Verified Complaint, Doc. No. 1; Heather Perry Affidavit, Ex. 9; Hank Williams, Jr. Video, file REC_0021 at 2:12-2:28, 10:55-11:25 and file REC_0023 at 7:00-7:40, Ex. 10 (in subfile 5-Boyce-Thompson-Front-ent); Protestor Photos, Ex. 16.

2004) (holding that ordinance imposing a fee to participate in parade, but providing no criteria for the sheriff's discretion in setting the fee amount, was unconstitutional under the unbridled discretion doctrine). But here, the evidence before the Court shows that the City has applied the ordinance in a content-neutral manner, looking at specific criteria: whether protestors or demonstrators are seeking to protest or demonstrate in the Restricted Area outside of the Protest Area during the restricted time.   *See City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 770 (1988).  "As always, enforcement requires the exercise of some degree of police judgment, and the degree of judgment involved here is acceptable."  *Hill*, 530 U.S. at 733 (cleaned up).

Olivier has not shown a likelihood that these criteria "leave the decision 'to the whim of the administrator.'" *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 321–25 (2002) (quoting *Forsyth Cty., Ga. V. Nationalist Movement*, 505 U.S. 123, 133 (1992)).   Accordingly, the vagueness challenge is without merit.

**B. Olivier has not shown that he will suffer irreparable harm.**

Because Plaintiff has not shown a likelihood of success on the merits of his claims, the Court should deny his request for a preliminary injunction for that reason alone. But the conclusion that a preliminary injunction should not issue is further bolstered by an analysis of irreparable harm.

Even in the First Amendment context, the issuance of a preliminary injunction requires an injury that is imminent or ongoing. *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). In support of his irreparable injury argument, Olivier references *Opulent Life Church*, 697 F.3d 279 (5th Cir. 2012). In that case, a church leased a property but was unable to occupy it because of a zoning ordinance that prevented it from using the building for religious services. *Id.* at 295–97. Each day that passed without an injunction was another day that the church could not occupy

the property, and another day of potential First Amendment violation. *See id*.

Here, by contrast, the subject ordinance has a limited and temporary application and provides an alternative which is specifically defined and useable without the necessity for pre-notice or permit and which does not prohibit the use of Olivier's preferred forms of communication.[94]  Moreover, outside of the restricted time in the Restricted Area and outside of the Protest Area, and within the City as a whole, there are no municipal ordinances that prevent protests and/or demonstrations in any traditional public fora.

Olivier admits that he never actually attempted to "evangelize" from within the Protest Area.[95]  He implies that the Protest Area was inferior for his purposes, and, if he were only able to preach in the better-trafficked Restricted Area, his message would have been more successful and that difference is his harm.[96]  But that assumption is insufficient to support a claim for the need of a preliminary injunction.  *See Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 579 (S.D.N.Y. 2009) ("The threatened irreparable harm must be actual and imminent, not remote or speculative." (cleaned up)).  The City has not prevented Olivier from conducting his activities inside the Protest Area or anywhere outside of the Restricted Area.

And, significantly, the last event of the year is scheduled for Sunday, November 14, 2021.[97]  Briefing on Olivier's motion for a preliminary injunction will not be complete in this case until Wednesday, November 17, 2021.[98]  Events for 2022 have yet to be announced, but the earliest an event would be held is late March 2022.   Olivier's alleged harm is not "imminent." *Hood*, 822 F.3d at 228.

Because there is a significant viable alternative available to Olivier to protest during

---

[94] *E.g.*, Ordinance, Ex. 2.
[95] *See* Verified Complaint, Doc. No. 1; Doc. No. 3-1.
[96] *Id.*
[97] *See* "Events," https://www.brandonamphitheater.com/events/ (last visited Nov. 9, 2021).
[98] *See generally* Docket.

events at the Amphitheater during the restricted time, and within the City as a whole, Olivier is not experiencing any ongoing or imminent harm at this time or in the near future. *See Hood*, 822 F.3d at 228.

### C. Olivier's injury does not outweigh harm to Defendants.

The inability of Olivier to proselytize in the restricted area near the main intersection at any upcoming events at the Amphitheater does not outweigh the potential harm, namely preventing the basic mandate to protect citizens from physical harm. Chief Thompson has stated that it is his belief as a law enforcement officer that allowing Olivier to operate in his desired location during events poses unacceptable levels of danger to pedestrians and vehicular traffic.[99] On the other hand, Olivier has not demonstrated how doing all those same activities from the Protest Area or any other unrestricted area is an irreparable harm to him.

### D. A preliminary injunction would disserve the public interest.

Granting Olivier's injunction would threaten public safety. Olivier's right to free speech is adequately protected by the narrow tailoring of the restriction, as to both time and space, as well as the designation of acceptable areas for his activities which are sufficiently similar to the restricted area in terms of foot traffic and potential eyes and ears to Olivier's message. Therefore, public policy would weigh against granting an injunction to Olivier.

CONCLUSION

Recent events underscore the importance of safety measures like those adopted by the City of Brandon.  This weekend, at least eight people lost their lives and hundreds of others were injured at Travis Scott's Astroworld Festival in Houston, Texas due to a lack of safety measures. The mayhem began prior to the concert when numerous people rushed past security through the

---

[99] Chief Thompson Affidavit, Ex. 1.

VIP entrance, and the chaos continued into the concert unimpeded by anyone in charge.[100]  Put simply, the Constitution does not prevent the implementation of reasonable restrictions to try and avoid such a tragedy before it occurs.  For all of the reasons explained herein, Olivier's preliminary injunction motion should be denied.

   Dated: November 10, 2021.

        Respectfully submitted,

        PHELPS DUNBAR LLP

BY: _/s/ *Mallory K. Bland*_____
        G. Todd Butler, MB #102907
        Mallory K. Bland, MB #105665
        4270 I-55 North
        Jackson, Mississippi 39211-6391
        Post Office Box 16114
        Jackson, Mississippi  39236-6114
        Telephone: 601-352-2300
        Telecopier: 601-360-9777
        Email: butlert@phelps.com
           mallory.bland@phelps.com

        **ATTORNEYS FOR DEFENDANTS**

---

[100] *See* https://www.cnn.com/2021/11/06/us/houston-astroworld-festival/index.html (last visited Nov. 9, 2021).

PD.35781303.1

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on November 10, 2021, I electronically filed this MEMORANDUM with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record.

*s/ Mallory K. Bland*
Mallory K. Bland
